IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

MOISES DAVID ESCOTO ROJAS and                    CASE:
EMMA ROJAS,

        Plaintiffs,

vs.

CITY OF MIAMI POLICE OFFICER
SHIELA BELFORT, individually,
MARIA CABRERA GONZALEZ, and
THE CITY OF MIAMI, a municipal corporation,

        Defendants.
_____/

## COMPLAINT

Plaintiffs, MOISES DAVID ESCOTO ROJAS and EMMA ROJAS, sue the Defendants,

Police Officer SHIELA BELFORT, individually, MARIA CABRERA GONZALEZ, The CITY

OF MIAMI, a Municipal Corporation, and allege:

### JURISDICTION AND VENUE

1.    This is an action for damages in excess of $15,000.00, exclusive of costs and

interest, and a civil rights claim pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth and

Fourteenth Amendments to the United States Constitution and the Florida Constitution.

2.    Venue is proper because all causes of action accrued in Miami-Dade County.

### THE PARTIES

3.    Plaintiffs MOISES DAVID ESCOTO ROJAS (hereafter "Moises") and EMMA

ROJAS (hereafter "Emma") at the time of the allegations of this complaint were citizens of the

state of Florida over the age of majority, residing in Miami-Dade County, Florida.

4.      At all times material to the allegations contained in this Complaint, Defendant OFFICER SHIELA BELFORT was a citizens of the State of Florida, and employed by the CITY OF MIAMI as a police officer with the City of Miami Police Department.

5.      Defendant MARIA CABRERA GONZALEZ at the time of the allegations of this complaint was a citizen of the State of Florida.

**FACTS**

6.      On or about June 9, 2014, around 7:30 a.m. Moises was driving westbound on SW Seventh Street in Miami, Florida when he noticed a marked City of Miami police vehicle behind him.

7.      Moises was driving below the speed limit, had not changed lanes improperly, had not nearly caused an accident, and had the correct tag on his vehicle.

8.      Moises's car was in good condition, with no impairments or defects that would warrant a citation.

9.      As Moises continued to drive cautiously, the police vehicle pulled up next to him and proceeded to drive next to him at the same speed.

10.      Moises is Hispanic. Police Officer SHELIA BELFORT (hereafter "Belfort"), who was driving the police vehicle, profiled him as Hispanic, and then pulled him over.

11.      Belfort was wearing a City of Miami uniform with City of Miami police insignia and a duty belt with a firearm.

12.      Officer Belfort's domestic partner and girlfriend, MARIA CABRERA GONZALEZ (hereafter "Gonzalez") was seated in the front passenger seat of the police vehicle.

2

13. Gonzalez was dressed like a detective, in plain clothes, with a police badge visibly hanging from a chain around her neck that identified her as a City of Miami police officer.

14. Gonzalez was also visibly wearing a firearm at her waist.

15. Gonzalez was not a police officer.

16. Upon being pulled over, Moises immediately called his mother, but did not get through. He then called his friend William, whom he knew from church.

17. Gonzalez got out of the passenger side of the police vehicle, approached Moises, and asked for his license and registration.

18. Moises gave her his registration and Honduras driver license.

19. Gonzalez asked why he had a Honduras license and not a Florida license.

20. Moises responded that he was undocumented.

21. Gonzalez immediately told him that she was going to call U.S. immigration officials to have him deported.

22. Gonzalez ordered Moises out of his car.

23. Officer Belfort got out of the police vehicle, gave handcuffs to Gonzalez, and told Gonzalez to arrest Moises.

24. Gonzalez placed the cuffs on Moises, and placed him in the back of the police vehicle.

25. Belfort and Gonzalez got back in the police vehicle, with Moises.

26. Moises speaks Spanish and very little English. Gonzalez spoke with Moises in Spanish and translated for Belfort.

27. In the police vehicle, Belfort handed Gonzalez a black, school-type notebook.

3

28.     Gonzalez, prompted by Belfort, asked Moises for his mother's name, phone number, and address.

29.     Moises provided the information, and Gonzalez wrote the information in the notebook.

30.     Gonzalez then called Moises's mother, Emma Rojas. Emma, however, did not answer.

31.     Meanwhile, elsewhere, Moises's friend William called Emma and told her Moises had been detained. Emma and her niece, Katya Damendia, drove to the location of the stop.

32.     Emma arrived on scene, saw her son in the back of the police vehicle and asked Gonzalez if she could speak with him.

33.     Gonzalez prohibited Emma from speaking with Moises.

34.     Emma started crying. Her other son had been murdered in Honduras thirteen years earlier, and she was afraid Moises might now be deported to Honduras, one of the most violent countries in the world.

35.     Emma fainted, and Gonzalez and Officer Belfort mocked her as being overly dramatic.

36.     Though Emma and her niece could have arranged to take Moises's vehicle, Belfort called a tow truck and had Moises's car towed. *See* Exhibit ("Ex."), Police Department Vehicle Storage Receipt.

37.     Belfort subsequently drove Moises and Gonzalez to the City of Miami police station at 2200 W Flagler St, Miami, FL 33135.

38.     Belfort pulled into the parking lot and dropped off Gonzalez, who got into a Black Mercedes Benz owned by Belfort. *See* Ex. B, Affidavit in Support of Arrest Warrant.

39.     After driving away in the Mercedes, Gonzalez contacted Emma and demanded $2,400 to free her son.

40.     Moises had previously paid a fine for improper fishing, but Gonzalez informed Emma that the fishing charge would be a basis for deportation.

41.     Gonzalez presumably obtained information about that charge from Officer Belfort or by looking herself through the Florida Department of Law Enforcement's Driver And Vehicle Information Database (DAVID), on the police computer in Belfort's police vehicle.

42.     Emma was from Honduras and all too familiar with the rampant and violent police corruption in that country. At the time, Honduras was renowned for its corruption and had the highest murder rate in the world.[1] Her other son had been murdered in Honduras thirteen years earlier. And now she was being extorted by someone she believed to be a detective. This was a nightmare, her blood pressure spiked, and she was terrified of the consequences to Moises.

43.     After speaking with Gonzalez, Emma desperately contacted family and friends to round up the $2400 to free her son.

44.     Meanwhile, Officer Belfort drove Moises on an extended tour of the city.

45.     Soon after leaving the first police station parking lot, Belfort took him to the downtown City of Miami police station and placed him in a holding cell for approximately fifteen minutes.

46.     She then put him back in her police vehicle.

47.     City of Miami Police Department Departmental Order 16.4.21.8 (valid through October 2013) for transporting prisoners mandated: "Transporting officers will stop to respond to the need for law enforcement services only when the risk to third parties is both clear and grave,

---

[1] For an overview of police corruption, including extrajudicial killings, see *World Report 2014: Honduras, Events of 2013*, Human Rights Watch, https://www.hrw.org/world-report/2014/country-chapters/honduras (last visited June 4, 2018).

and the risk of injury to the prisoner or opportunity of escape is minimal." *See* Ex. C, City of Miami Police Department Departmental Orders (Current through October 2013) (hereafter "Departmental Orders").

48.   Yet, Officer Belfort subsequently stopped, with Moises in her vehicle, on Flagler Street and spent approximately 45 minutes chatting with an officer who had detained a couple, despite any risk of grave injury to any third parties.

49.   Later Belfort took Moises to another police station, on Coral Way, where he was cuffed to a bench for approximately ten minutes while Belfort spoke with another officer.

50.   Belfort then put Moises back in her car and continued transporting him all over town as she continued with her shift.

51.   City of Miami police department order 16.4.21.2 for transporting prisoners mandates: "Prisoners will be transported directly to a police station or a Miami-Dade Jail or holding facility. If there is a delay in transporting, or another destination, supervisory approval is required." *See* Ex. C, Departmental Orders.

52.   Moises had been detained at 7:30 a.m., formally arrested at 7:45 a.m., and at approximately 4:15 p.m., over eight hours later, Belfort finally transported him to Turner Guilford Knight Correctional Facility (hereafter "TGK"), where he was booked.

53.   Belfort did not provide him with lunch or any other food. And she repeatedly ignored his requests, in English, to use a bathroom.

54.   Moises spent over seven and a half hours in the back of Belfort's police car with his hands cuffed behind his back, with two ten to fifteen minute breaks.

55.   This posture was excruciatingly painful, caused numbness in his arms and shoulders, and resulted in permanent, chronic pain in his shoulders to this day.

6

56.     Moises was arrested for driving without a valid license, and cited for no proof of insurance, tag not assigned to vehicle, and failing to signal when changing lanes almost causing an accident. *See* Ex. D, Arrest Affidavit, Citations, Incident Report.

57.     Meanwhile, Emma, terrified as to the state of her son, got together the money demanded, and met with Gonzalez, and paid her $2,400.

58.     Much later in the day, Moises's girlfriend learned that Moises had been booked, realized that the police were not going to release Moises, and posted his bond.

59.     On June 10, 2014, the day after the incident, Moises and Emma filed a complaint with the City of Miami Police Department's Internal Affairs division. *See* Ex. E, Letters from City of Miami Internal Affairs Section.

60.     On or about August 27, 2014, Moises attended a court hearing for the traffic violations.

61.     As Moises was leaving the courthouse, Officer Belfort and Immigration and Customs Enforcement (hereafter "ICE") agents were waiting outside for Moises. Belfort identified Moises to the agents, who then arrested him for an immigration violation.

62.     In other words, Belfort attempted to get rid of the key witness against her.

63.     Indeed, Moises was held in ICE custody and deported to Honduras.

64.     Because of his removal from the U.S. by ICE, Moises was hampered in any efforts to take legal action against Officer Belfort and Gonzalez.

65.     On or about February 20, 2016, Gonzalez was arrested, and the State of Florida charged Gonzalez with two felonies: Grand Theft Third Degree (§ 812.014(2)(C), Fla. Stat.) and Falsely Personate an Officer in the Commission of a Felony (§ 843.08, Fla. Stat.), in case

F16002841. *See* Ex. B, Affidavit in Support of Arrest Warrant; Ex. F, State Attorney Office Bond Hearing Notes and Information.

66.     On March 11, 2016 Gonzalez pled guilty, was adjudicated guilty, and was sentenced to credit time served (21 days) and one year community control followed by four years probation. Sentencing requirements included: no ride alongs with law enforcement, and no work or volunteering where she would wear a uniform indicating any form of public trust. *See* Ex. G, Judgment and State Attorney Case File Sentencing Notes.

67.     Gonzalez, as part of her plea, paid Emma $2,400 in restitution. *See* Ex. G, State Attorney Case File Sentencing Notes and Restitution Check.

68.     Upon information and belief, neither the State of Florida nor the City of Miami has taken action again Officer Belfort.

## Count 1
### INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS
### State tort claim: Plaintiff Emma Rojas v. Defendant Gonzalez

69.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

70.     On or about June 9, 2014, defendant Gonzalez intentionally inflicted emotional distress on Emma.

71.     When Emma arrived on the scene of the arrest, she spoke with Gonzalez and requested to speak with her son in the car. When she was refused access to her son, Emma became distraught and fainted. Gonzalez laughed at Emma, and mocked and ridiculed her as being overly dramatic.

72.     Later, Gonzalez repeatedly contacted Emma on the phone and met with her in person and continually threatened that if she did not pay money, her son would not be released. And when Emma paid Gonzalez, Gonzalez demanded additional money. Gonzalez's threats were designed to strike fear in Emma, so that she would pay for her son's release.

73.     Gonzalez's conduct of impersonating an officer by riding in a police vehicle and wearing a police badge and a gun, threatening to have Emma's son deported, and demanding money from Emma to procure her son's release was extreme and outrageous.

74.     Gonzalez's conduct caused Emma severe emotional distress. As a result of Gonzalez's actions, Emma experienced dangerously high blood pressure, intense panic, intense fear, and post-traumatic stress (PTSD) in that Emma now panics whenever she sees a police officer.

75.     Emma is entitled to punitive damages, compensatory damages, actual damages, reasonable attorney fees and court costs, damages for pain and suffering, nominal damages and/or any other remedies the court deems appropriate.

<u>**Count 2**</u>
**FRAUD, FRAUDULENT MISREPRESENTATION & FRAUD IN THE INDUCEMENT**
**State Tort Claim: Plaintiff Emma Rojas v. Defendant Gonzalez**

76.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

77.     On or about June 9, 2014, defendant Gonzalez committed the torts of fraud, fraudulent misrepresentation and fraud in the inducement against Plaintiff Emma Rojas.

78.     On or about June 9, 2014, defendant Gonzalez fraudulently misrepresented herself to Emma as a police officer. Gonzalez knew that she was not a police officer and that her representation was false.

79.     Gonzalez made the representation intending for Emma to rely upon it and to induce Emma to give her money.

80.     Emma believed that Gonzalez was an officer, and relying on her misrepresentation, paid Gonzalez $2,400, to her detriment, to obtain the release of her son, Moises, and avoid additional harm to Moises.

81.     Gonzalez never intended to procure Moises's release, and Moises was booked at TGK and deported.

82.     As a result of this misrepresentation, Emma provided Gonzalez with $2,400 that Gonzalez was not entitled to.

83.     As a result of this misrepresentation, on June 9, 2014 Emma experienced high blood pressure, intense panic, and fear during the hours she tried to obtain money and negotiated with Gonzalez.

84.     As a direct and proximate result of this misrepresentation, Emma suffers post-traumatic stress disorder (PTSD) in that Emma now panics whenever she sees a police officer.

85.     Emma in entitled to damages, including interest, punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 3
### CONVERSION
**State Tort Claim: Plaintiff Emma Rojas v. Defendant Gonzalez**

86.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

87.     On or about June 9, 2014, defendant Gonzalez converted to her own use $2,400 that was then the property of plaintiff Emma Rojas.

88.     Emma had a right to the property in that friends and family voluntarily gave her the $2,400.

89.     Gonzalez misconducted herself intentionally when she falsely represented herself as a police officer and by means of extortion unlawfully threatened and coerced Emma to pay the money.

90.     Emma subsequently filed an internal affairs complaint with City of Miami, seeking return of the money.

91.     On or about February 20, 2016, Gonzalez was arrested and charged with grand theft for stealing Emma's money.

92.     Gonzalez entered a not guilty plea, and still refused to return the $2,400.

93.     On or about March 11, 2016, Gonzalez plead guilty to grand theft, for stealing the $2,400 from Emma.

94.     As part of her criminal plea, Gonzalez paid Emma $2,400 in restitution.

95.     Gonzalez did not pay Emma any interest.

96.     Emma is entitled to damages, including interest, punitive damages, compensatory damages, actual damages, nominal damages, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 4
### BATTERY
### State Tort Claim: Plaintiff Moises v. Defendant Gonzalez

97.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

98.     On or about June 9, 2014, Gonzalez battered Moises.

99.     On that day, Moises had been pulled over for alleged traffic violations, none of which were felonies.

100.    Gonzalez was unlawfully impersonating a police officer and had no legal authority to detain Moises.

101.    Gonzalez intentionally placed handcuffs on Moises and placed him in the back of Belfort's police vehicle.

102.    Moises, believing Gonzalez was a police officer, did not consent to being cuffed and otherwise touched by Gonzalez.

103.    Gonzalez's conduct was offensive to Moises, who was simply trying to go to work, and had no desire to be cuffed and manhandled.

11

104.    Gonzalez cuffed Moises with his hands behind his back.

105.    Gonzalez's cuffing Moises behind his back was not only uncomfortable at first, but harmful in that it contributed to the excruciating pain and numbness Moises later felt that day in his shoulders and arms.

106.    As a direct and proximate result of Gonzalez's cuffing, Moises developed permanent, chronic pain in his arms and shoulders.

107.    Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

<u>**Count 5**</u>
**FALSE IMPRISONMENT**
**State Tort Claim: Plaintiff Moises v. Defendant Gonzalez**

108.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

109.    On or about June 9, 2014, Gonzalez falsely imprisoned Moises.

110.    On that day, Moises had been pulled over for alleged traffic citations, none of which were felonies.

111.    Nevertheless, Gonzalez, who was not a police officer but was impersonating an officer, demanded Moises's license and registration, threatened to have him deported, ordered him out of his vehicle, placed him in handcuffs, and put him in the back of the police vehicle.

112.    Gonzalez acted against Moises's will, as Moises had zero desire to be ordered out of his car, placed in cuffs and put in the back of a police car.

113.    In taking these actions, Gonzalez unlawfully restrained Moises and detained him against his will.

114.    Gonzalez took these measures maliciously in order to subsequently extort Moises's family for money.

115.    Moises was terrified when Gonzalez threatened to have him deported, ordered him out of the car, cuffed him, and placed him in the back of the police car.

116.    As a result of Gonzalez's actions, Moises was deported to Honduras, where his wages are significantly less than what he was earning on June 2014. In Miami he was earning $5,500 to $6,000 per month installing marble and tiles. Now in Honduras he earns $300 per month.

117.    Moises suffered indignity and humiliation in being falsely imprisoned by Gonzalez.

118.    The cuffs were also extremely uncomfortable, and it was extremely uncomfortable when Gonzalez placed him in the back of the police vehicle with his hands cuffed behind his back.

119.    Her cuffing him resulted in excruciating pain and numbness in his arms and shoulders that day, and was that direct and proximate cause of the pain Moises continues to experience in his shoulders and arms today.

120.    Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

**Count 6**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 claim: Plaintiff Emma Rojas v. Defendant Belfort**

121.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

122.    Pursuant to 42 U.S.C. § 1983, Officer Belfort violated Emma's Fourteenth Amendment rights under the U.S. Constitution when, acting under color of authority, she

conspired, schemed, and acted in concert with Gonzalez to deprive Emma of her property, $2,400, without due process of law.

123.    Belfort was acting under color of authority.

124.    On June 9, 2014, Officer Belfort was a City of Miami police officer, on duty, when she pulled over Emma's son, Moises, at 7:30 a.m.

125.    Belfort was driving a marked police vehicle provided to her by the City of Miami.

126.    Belfort was wearing a police uniform with insignia identifying her as a City of Miami police officer, a uniform she was required to wear while on duty.

127.    Belfort was wearing a duty belt with a firearm, which she was required to wear while on duty.

128.    Belfort acted in concert with Gonzalez to extort money from Emma.

129.    When Moises was pulled over, Belfort's domestic partner, Gonzalez, was in the front seat of Belfort's police vehicle.

130.    Belfort had invited Gonzalez to be in the car with her, without authorization from anyone else at the police department.

131.    Belfort knew that Gonzalez was not a police officer.

132.    Belfort knew and could see that Gonzalez was wearing a police badge around her neck and that Gonzalez was openly wearing a firearm in her waistband.

133.    Gonzalez was openly carrying a firearm in violation of Florida law, a second degree misdemeanor.

134.    As part of their scheme, Belfort gave Gonzalez permission to be in her car, impersonating an officer.

135.    Belfort would later tell investigators that she needed Gonzalez to translate for her, because Belfort did not speak Spanish.

136.    Belfort did not explain why her translator needed to dress as an officer and illegally carry a firearm.

137.    Upon stopping Moises, Belfort permitted and encouraged Gonzalez to act as a police officer and approach Moises's car and ask for license and registration.

138.    Belfort permitted Gonzalez to order Moises out of the car, even though Moises had committed no felony.

139.    Belfort gave her handcuffs to Gonzalez and permitted Gonzalez to handcuff Moises.

140.    Belfort permitted Gonzalez to place Moises in the back of her police car.

141.    Belfort permitted Gonzalez to call from the car Emma, Moises's mother.

142.    Belfort gave Gonzalez a notebook to write Emma's name, address and phone number.

143.    Belfort drove Gonzalez and Moises to a police substation parking lot and dropped off her purported translator.

144.    Belfort watched Gonzalez get into a Mercedes Benz registered to Belfort.

145.    Belfort told investigators that after she dropped off Gonzalez, she took Moises to TGK.

146.    It appears Belfort failed to mention that she drove Moises around for over seven and a half hours, until approximately 4:15 p.m., when she finally took Moises to TGK to be booked, after Gonzalez had extorted $2,400 from Emma.

147.    Belfort allowed Gonzalez to call Moises's mother in the police car in order to extort money, and not for the purpose of having Emma come get Moises's car. Despite Emma's arrival on the scene of the arrest, Belfort had Moises' car towed.

148.    Belfort subsequently learned that Moises and his mother filed a complaint against her with the City of Miami Department of Internal Affairs.

149.    Later, on August 27, 2014, when Moises went to court to settle his citations, Belfort called ICE, came to court, and pointed out Moises to ICE agents, so that they might arrest him and deport him.

150.    In other words, Belfort not only retaliated against Moises for filing the complaint, but sought to get rid of him—the key witness against her—by having him deported to Honduras.

151.    Belfort ignored City of Miami police departmental orders when she drove Moises around for over seven hours without obtaining permission from a supervisor before taking Moises to TGK. She also ignored orders when she stopped to talk with an officer for 45 minutes with Moises in the back of the car, and when there was no risk of danger to third parties. Keeping Moises in the car over seven hours, without getting him food, and without letting him use the bathroom, violated departmental orders and points to Belfort's true intent, which was to detain Moises herself until Gonzalez could extract money from her prisoner's mother.

152.    Belfort and her accomplice Gonzalez together extorted $2,400 from Emma, without due process.

153.    Emma is entitled to damages, including punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

**Count 7**
**CONVERSION**
**State tort claim: Plaintiff Emma Rojas v. Defendant Belfort**

154.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

155.     On or about June 9, 2014, Officer Belfort conspired, schemed and acted in concert with Gonzalez to convert to her and Gonzalez's use $2,400 that was then the property of plaintiff Emma Rojas.

156.     Emma had a right to the property in that friends and family lent her the $2,400.

157.     Belfort acted in concert with Gonzalez to extort money from Emma.

158.     Belfort planned and schemed with Gonzalez to extort money, and drove Gonzalez in her police vehicle that morning on June 9, 2014 with the intention of pulling over a driver who was in the country illegally and extorting his or her family for money.

159.     Gonzalez had a gambling problem, which Belfort knew about.

160.     Belfort and Gonzalez cooked up this scheme to pay off Gonzalez's gambling debt.

161.     The plan called for Belfort to drive around the prisoner while Gonzalez, who spoke Spanish, contacted the prisoner's family and extorted money.

162.     Belfort thus invited Gonzalez into her police vehicle and allowed and encouraged Gonzalez to impersonate a police officer.

163.     Belfort knew well that Gonzalez, her domestic partner, was not a police officer or any sort of government agent authorized to make arrests.

164.     Yet Belfort permitted and encouraged Gonzalez to approach Moises's vehicle, and question Moises to ascertain if the driver was in fact an illegal immigrant.

165.     Once Gonzalez determined that Moises had no Florida license and only a Honduras passport, Belfort instructed Gonzalez to arrest Moises.

166.    Belfort gave Gonzalez handcuffs.

167.    Gonzalez placed the cuffs on Moises and placed him in the back of the police vehicle.

168.    Belfort provided Gonzalez with a notebook.

169.    Gonzalez asked Moises for the name, address and phone number of his mother.

170.    Gonzalez wrote down this information in the notebook.

171.    Gonzalez then, with Belfort's approval and encouragement, tried to call Emma.

172.    Gonzalez, however, did not get through.

173.    Belfort later drove Gonzalez and Moises to a police substation parking lot, where she dropped off Gonzalez, and waited as Gonzalez got into Belfort's Black Mercedes.

174.    Earlier, Belfort had either looked for Moises's priors in the DAVID computer system herself, or authorized and encouraged Gonzalez to look in the system.

175.    Either way, with Belfort's help or authorization, Gonzalez learned that Moises had been previously cited for illegal fishing.

176.    Belfort wanted Gonzalez to have this information, to assist with the shakedown.

177.    Indeed, Gonzalez bolstered the threat of deportation by informing Emma that her son could be deported because of the prior fishing incident.

178.    While Gonzalez engaged with Emma to extort the money, Belfort drove Moises around in her police vehicle, against regulations, for over seven hours, affording her accomplice time to contact Emma, who in turn needed time to gather money from family and friends.

179.    Only once Gonzalez obtained the money did Belfort drive Moises to TGK to be booked.

180.    On June 10, 2014, Emma and Moises filed an internal affairs complaint with City of Miami, seeking return of the money.

181.    On or about February 20, 2016, Belfort's accomplice, Gonzalez, was arrested and charged with grand theft for stealing Emma's money, and entered a not guilty plea.

182.    While the criminal case was pending, Gonzalez refused to return the $2,400.

183.    On the day after the incident, Belfort was made aware that Moises had gone to the police and complained about the money taken from his family.

184.    Yet Belfort did nothing to return the $2,400 she had conspired and schemed to extort and convert to her and Gonzalez's use.

185.    On or about March 11, 2016, Gonzalez plead guilty to grand theft, for stealing the $2,400 from Emma.

186.    As part of her criminal plea, Gonzalez paid Emma $2,400 in restitution.

187.    Neither Gonzalez nor Belfort paid Emma any interest.

188.    Emma is entitled to damages, including interest, punitive damages, compensatory damages, actual damages, nominal damages, damages from pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 8
### FRAUD, FRAUDULENT MISREPRESENTATION & FRAUD IN THE INDUCEMENT
### State tort claim: Plaintiff Emma Rojas v. Defendant Belfort

189.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

190.    On or about June 9, 2014, Officer Belfort conspired, schemed and acted in concert with Gonzalez to extort money from Emma, and as part of this scheme Belfort fraudulently misrepresented that her accomplice was a police officer and induced Emma to hand over money to Gonzalez.

191.    Belfort knew that Gonzalez was not a police officer and that representing Gonzalez as a police officer was false.

192.    When Emma showed up on the scene of the arrest, Belfort encouraged Gonzalez to represent herself as a police officer and acted as if Gonzalez was a police officer.

193.    Belfort and Gonzalez pretended Gonzalez was a police officer so that Emma would rely upon that belief later on when Gonzalez would contact Emma to extort money from her.

194.    Because Belfort was wearing a full uniform and had a marked police vehicle, and treated Gonzalez as if she were a police officer, Emma believed that Gonzalez was in fact an officer.

195.    Emma relied on Belfort and Gonzalez's misrepresentation, and thus paid Gonzalez $2,400, to her detriment, to obtain the release of her son, Moises, and avoid additional harm to Moises.

196.    Belfort never intended to release Moises, and Moises was booked at TGK and deported.

197.    As a result of this misrepresentation, Emma provided Belfort $2,400 through Belfort's conspirator Gonzalez.

198.    As a result of this misrepresentation, on June 9, 2014 Emma experienced dangerously high blood pressure, intense panic, and fear during the hours she negotiated with Gonzalez and tried to obtain money.

199.    As a direct and proximate result of this misrepresentation, Emma suffers post-traumatic stress disorder (PTSD) in that Emma was traumatized and now panics whenever she sees a police officer.

200.    Emma in entitled to damages, including interest, punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

**Count 9**
**INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS**
**State tort claim: Plaintiff Emma Rojas v. Defendant Belfort**

201.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

202.    On or about June 9, 2014, Officer Belfort conspired, schemed and acted in concert with Gonzalez to extort money from Emma, and as part of this scheme intentionally inflicted emotional distress on Emma.

203.    At all times material to this incident, Gonzalez was Belfort's accomplice.

204.    Belfort and Gonzalez concocted a scheme to pull over a driver, ascertain that he or she was an illegal immigrant, and then extort money from the driver's family.

205.    On June 9, 2014, Belfort and Gonzalez carried out their scheme.

206.    Belfort invited Gonzalez into her police vehicle and allowed and encouraged Gonzalez to impersonate a police officer.

207.    Belfort knew well that Gonzalez, her domestic partner, was not a police officer or any sort of government agent authorized to make arrests.

208.    Yet Belfort permitted and encouraged Gonzalez to approach Moises's vehicle, and question Moises to ascertain if the driver was in fact an illegal immigrant.

209.    Once Gonzalez determined that Moises had no Florida license and only a Honduras passport, Belfort instructed Gonzalez to arrest Moises.

210.    Belfort gave Gonzalez handcuffs.

211.    Gonzalez placed the cuffs on Moises and placed him in the back of the police vehicle.

21

212.   Belfort provided Gonzalez with a notebook.

213.   Gonzalez asked Moises for the name, address and phone number of his mother.

214.   Gonzalez wrote down this information in the notebook.

215.   Gonzalez then, with Belfort's approval and encouragement, tried to call Emma.

216.   Gonzalez, however, did not get through.

217.   Belfort later drove Gonzalez and Moises to a police substation parking lot, where she dropped off Gonzalez, and waited as Gonzalez got into Belfort's Black Mercedes.

218.   While Gonzalez engaged with Emma to extort the money, Belfort drove Moises around in her police vehicle, against regulations, for over seven hours, affording her accomplice time to contact Emma, who in turn needed time to gather money from family and friends.

219.   Only once Gonzalez obtained the money did Belfort drive Moises to TGK to be booked.

220.   Belfort and Gonzalez acted recklessly or intentionally.

221.   When Emma arrived on the scene of the arrest, she spoke with Gonzalez and requested to speak with her son in the car. When she was refused access to her son, Rojas became distraught and fainted. Gonzalez and Belfort laughed at Emma, and mocked and ridiculed her as being overly dramatic.

222.   Later, as part of their scheme, Gonzalez repeatedly contacted Emma on the phone, met with her in person, and continually threatened that if she did not pay money, her son would not be released. And when Emma paid Gonzalez, Gonzalez demanded additional money, sparking further fear in Emma. Gonzalez's threats, as planned with Belfort, were designed to strike fear in Emma, so that she would pay for her son's release.

223.    To bolster the threat, Belfort and Gonzalez schemed that Belfort or Gonzalez would obtain information about any priors the pulled-over-driver had by going into the DAVID database through the onboard computer in Belfort's police vehicle .

224.    Belfort provided Gonzalez with information about Moises's prior fishing citation and/or allowed Gonzalez to access the DAVID system herself to gain such information, so that Gonzalez could bolster their threat to have Moises deported. Such information was intentionally used to strike fear in Emma.

225.    Belfort allowed and encouraged Gonzalez to impersonate an officer by wearing a police badge and a gun. Belfort invited Gonzalez into her police vehicle and drove her around in order to carry out their scheme. Belfort's actions in concert with Gonzalez, which include mocking Emma after she passed out, threatening to have Emma's son deported, and demanding money from Emma to procure her son's release were extreme and outrageous.

226.    Belfort's actions in concert with Gonzalez's conduct caused Emma severe emotional distress.

227.    On June 9, 2014 Emma experienced dangerously high blood pressure, intense panic, and fear during the hours she tried to obtain money and negotiated with Belfort's accomplice Gonzalez.

228.    As a direct and proximate result of Belfort and Gonzalez's concerted actions, Emma suffers post-traumatic stress disorder (PTSD) in that Emma was traumatized and now panics whenever she sees a police officer.

229.    Emma is entitled to punitive damages, compensatory damages, actual damages, damages for emotional pain and suffering, reasonable attorney fees and court costs, nominal damages and/or any other remedies the court deems appropriate.

**Count 10**
**USE OF EXCESSIVE FORCE AND CRUEL AND INHUMANE TREATMENT**
**UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 claim: Plaintiff Moises v. Defendant Belfort**

230.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

231.    Pursuant to 42 U.S.C. § 1983, Officer Belfort violated Moises's Fourteenth Amendment due process rights under the U.S. Constitution when, acting under color of authority, she used excessive force.

232.    Belfort was acting under color of authority.

233.    On June 9, 2014, Officer Belfort was a City of Miami police officer, on duty, when she pulled over Emma's son, Moises, at 7:30 a.m.

234.    Belfort was driving a marked police vehicle provided to her by the City of Miami.

235.    Belfort was wearing a police uniform with insignia identifying her as a City of Miami police officer, a uniform she was required to wear while on duty.

236.    Belfort was wearing a duty belt with a firearm, which she was required to wear while on duty.

237.    Belfort used excessive force against Moises.

238.    City of Miami police department orders require that prisoners be transported directly to a police station or a Miami-Dade Jail or holding facility. *See*, *e.g.*, Ex. C, Departmental Order 16.4.21.2. If there is a delay in transporting, or another destination, supervisory approval is required. *Id.*

239.    Belfort ignored the departmental orders and for all but approximately 30 minutes of her over eight hour custody of Moises on June 9, 2014, kept him in her police car, with his hands cuffed behind his back.

240.    Having his arms and shoulders in this posture was excruciatingly painful. His arms and shoulders also became numb.

241.    Keeping him in this posture for that long was unnecessary.

242.    Moises had no violent priors.

243.    Belfort could have left him at a police station in a holding cell, where he would not have been cuffed behind his back.

244.    Belfort could have taken him to TGK, where he would not have been cuffed behind his back.

245.    Moises had no pain in his shoulders prior to June 9, 2014 but has had strong pains in his shoulders and arms since that day.

246.    Keeping him in her car this way for that long was cruel and inhumane, as Belfort only did so to gain time while her partner Gonzalez extorted money from Moises's mother.

247.    It appears that no supervisor signed off on Belfort's keeping Moises in her police car for any extended period of time.

248.    Belfort also cruelly and inhumanely prohibited Moises from using a toilet, despite his repeated demands.

249.    City of Miami Police Department Departmental Order (Current through October 2013) 16.4.21.7 states that "Stopping for prisoners to use toilet facilities or to eat is prohibited unless approved by a supervisor. Then, the facility will be chosen at random with security of the prisoner in mind."

250.    Had Belfort dropped off Moises at TGK or a police station, Moises would have had access to a restroom, and lunch.

251.    Belfort made no attempt to get a supervisor's permission to take Moises to an external restroom or food vendor because she knew what she was doing was wrong.

252.    Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

**Count 11**
**VIOLATION OF MOISES'S EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 claim: Plaintiff Moises v. Defendant Belfort**

253.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

254.    Pursuant to 42 U.S.C. § 1983, Officer Belfort violated Moises's Fourteenth Amendment equal protection rights when she pulled up next to him, observed that he was Hispanic, and pulled him over without probable cause.

255.    Belfort was acting under color of authority.

256.    On June 9, 2014, Officer Belfort was a City of Miami police officer, on duty, when she pulled over Emma's son, Moises, at 7:30 a.m.

257.    Belfort was driving a marked police vehicle provided to her by the City of Miami.

258.    Belfort was wearing a police uniform with insignia identifying her as a City of Miami police officer, a uniform she was required to wear while on duty.

259.    Belfort was wearing a duty belt with a firearm, which she was required to wear while on duty.

260.    Belfort claims she pulled Moises over because he improperly changed lanes almost causing an accident and because the tag did not match the vehicle.

261.    In fact, the tag did match the vehicle, and Moises had not changed lanes improperly and/or nearly caused an accident.

262.     Because Belfort profiled Moises as Hispanic, hoping he was an illegal immigrant whose family could easily be extorted for fear of deportation, Moises was painfully and excruciatingly handcuffed behind his back over seven and a half hours, and suffers permanent pain in his shoulders as a result.

263.     As the direct and proximate result of Belfort's profiling Moises and violating his equal protection rights under the Fourteenth Amendment of the U.S. Constitution, Moises was deported and earns significantly less in Honduras than he did in the U.S.

264.     Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, economic damages, damages for pain and suffering, nominal damages, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 12
**ILLEGAL DETENTION AND ARREST WITHOUT CAUSE IN VIOLATION OF MOISES'S RIGHTS UNDER THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 Claim: Plaintiff Moises v. Defendant Belfort**

265.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

266.     Pursuant to 42 U.S.C. § 1983, Officer Belfort violated Moises's Fourth, Fifth and Fourteenth Amendment rights under the U.S. Constitution when, acting under color of authority, she pulled him over without cause.

267.     Belfort was acting under color of authority.

268.     On June 9, 2014, Officer Belfort was a City of Miami police officer, on duty, when she pulled over Emma's son, Moises, at 7:30 a.m.

269.     Belfort was driving a marked police vehicle provided to her by the City of Miami.

270.     Belfort was wearing a police uniform with insignia identifying her as a City of Miami police officer, a uniform she was required to wear while on duty.

271.   Belfort was wearing a duty belt with a firearm, which she was required to wear while on duty.

272.   Belfort claims she pulled Moises over on June 9, 2014 because he improperly changed lanes, almost causing an accident, and because his tag did not match his vehicle.

273.   In fact, the tag did match the vehicle, and Moises had not changed lanes improperly and/or nearly caused an accident.

274.   Had she not pulled Moises over illegally, Belfort would not have asked for his license and registration, arrested him and caused him to be deported.

275.   As the direct and proximate result of Belfort's illegally detaining Moises and violating his Fourth, Fifth and Fourteenth Amendment rights under the U.S. Constitution, Moises was painfully and excruciatingly handcuffed behind his back over seven and a half, suffers permanent pain in his shoulders and arms as a result, was deported and now earns significantly less in Honduras than he did in the U.S.

276.   Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, economic damages, damages for pain and suffering, nominal damages, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 13
### BATTERY
### State tort claim: Plaintiff Moises v. Defendant Belfort

277.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

278.   Officer Belfort battered Moises on June 9, 2014.

279.   Because Belfort pulled over Moises on June 9, 2014 without any cause, his arrest was unlawful.

280.   She therefore had no right to detain him, touch him, or place cuffs on him.

281.   Belfort however did touch him and put cuffs on him, against his will.

282.    Belfort knew that she had detained him illegally, for the purpose of extorting money from his family.

283.    Belfort intentionally made physical contact with Moises by, for example, removing him from her police car, placing him in the police car, cuffing him to a bench, and removing the cuffs once he was at TGK.

284.    This contact was harmful and offensive.

285.    Keeping Moises in cuffs for over seven and a half hours was excruciatingly painful, caused his arms and shoulders to become numb at the time, and caused Moises to suffer ongoing, permanent pain in his arms and shoulders.

286.    Moises did not have chronic pain in his shoulders and arms prior to June 9, 2014.

287.    Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, damages for pain and suffering, nominal damages, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

## Count 14
## FALSE IMPRISONMENT
### State tort claim: Plaintiff Moises v. Defendant Belfort

288.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

289.    Officer Belfort falsely imprisoned Moises on June 9, 2014.

290.    Because Belfort pulled over Moises on June 9, 2014 without any cause, his arrest was unlawful. She therefore had no right to detain him, or to authorize anyone else to detain him.

291.    Belfort acted against Moises's will, as Moises had zero desire to be ordered out of his car, placed in cuffs and put in the back of a police car. But in doing so, Belfort unlawfully restrained Moises and detained him against his will.

292.    Belfort took these measures maliciously in order to subsequently extort Moises's family for money, in concert with Gonzalez, her accomplice.

293.    Moises was terrified when Gonzalez, with Belfort's encouragement, threatened to have Moises deported, ordered him out of the car, cuffed him, and placed him in the back of Belfort's police car.

294.    Belfort then kept Moises illegally detained in her car for over seven hours, with his hands cuffed behind his back.

295.    This extended false imprisonment caused Moises excruciating pain in his shoulders and arms, and also numbness.

296.    As a result of this false imprisonment, Moises continues to suffer chronic pain in his shoulders and arms. Moises did not have chronic pain in his shoulders and arms prior to June 9, 2014.

297.    As a result of Belfort's actions, Moises was deported to Honduras, where his wages are significantly less than what he was earning on June 2014. In Miami he was earning $5,500 to $6,000 per month installing tile. Now in Honduras he earns $300 per month.

298.    Moises suffered indignity and humiliation in being falsely imprisoned by Belfort.

299.    Moises is entitled to damages, including punitive damages, compensatory damages, actual damages, economic damages, nominal damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

### Count 15
**BATTERY, FALSE IMPRISONMENT, USE OF EXCESSIVE FORCE, AND VIOLATION OF DUE PROCESS AND SEIZURE RIGHTS UNDER FLORIDA CONSTITUTION ARTICLE I, SECTIONS 9 AND 12**
**Florida Tort Claims Act: Plaintiff Moises v. Defendant City of Miami**

300.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 68.

301.    On June 9, 2014, Officer Belfort was an employee of the City of Miami, a municipal corporation.

302.    Officer Belfort was on duty and acting within the scope of her employment when she detained Moises that day.

303.    Regardless of her subjective intent (i.e., to extort money or not extort money), Belfort pulled Moises over without cause.

304.    Moises had not changed lanes improperly, had not nearly caused an accident, did not have the wrong tag on his vehicle, and was committing no other visible infraction.

305.    Belfort stopped Moises without cause and thus detained him illegally.

306.    Had Belfort not pulled him over (i.e., without cause), she would not have discovered that he was driving without a valid license, and would have had no basis to arrest him, and have him cuffed and placed in the rear of her police vehicle.

307.    However, after she made the illegal stop at 7:30 a.m., Belfort learned that Moises lacked a valid driver license, which is a second degree misdemeanor.

308.    On this basis she arrested Moises at 7:45 a.m. *See* Ex. B, Arrest Affidavit.

309.    Although the original stop was without cause and illegal, her arrest of Moises was motivated, at least in part, by a purpose to serve the principal, the City of Miami Police Department.

310.    Between 7:45 a.m. (the actual time of the arrest, pursuant to the arrest affidavit) and approximately 4:15 p.m. Moises remained under Belfort's control.

311.    In her control, Moises was cuffed behind his back, and placed in her police vehicle.

312.    Shortly after detaining him, Belfort took Moises to the downtown police station, and placed him in a holding cell for approximately fifteen minutes.

31

313.    Belfort then placed him back in cuffs, hands behind his back, and put him back in her police vehicle.

314.    Belfort subsequently took him inside a second police station, for approximately ten minutes, where he was cuffed to a bench.

315.    Belfort then re-cuffed him with hands behind his back and placed Moises back in her police vehicle.

316.    Belfort then continued to drive Moises around this way until she took him to TGK at approximately 4:15 p.m.

317.    Regulations require that prisoners be cuffed behind their backs during transport. *See*, *e.g.*, Ex. C, Departmental Order 16.4.2.

318.    Transporting prisoners to a stationhouse or jail permits the prisoner to remain in custody without being handcuffed behind his or her back.

319.    Having his hands cuffed behind his back for over seven and a half hours was excruciatingly painful for Moises.

320.    Moises's arms and shoulders became numb.

321.    Keeping Moises cuffed behind his back for over seven and a half hours was unnecessary and excessive.

322.    Moises had no violent priors.

323.    City of Miami police departmental orders require that prisoners be transported directly to a police station or a Miami-Dade Jail or holding facility. *Id*. at 16.4.21.2. If there is a delay in transporting to the jail or police station, or another destination is involved, supervisory approval is required. *Id*.

32

324. Belfort could have left Moises at a police station in a holding cell, where he would not have been cuffed behind his back.

325. Belfort could have taken him directly to TGK, where he would not have been cuffed behind his back.

326. Instead, Belfort ignored departmental orders and drove him around for hours and hours.

327. It is believed that no supervisor signed off on Belfort's keeping Moises in her police car for any extended period of time.

328. Keeping Moises cuffed behind his back for over seven and a half hours constituted excessive force. Belfort used more force than necessary to detain Moises during the over seven and a half hours he was cuffed behind his back.

329. This level of restraint was unreasonable and not only subjected Moises to unnecessary risk of harm but permanently harmed him.

330. Moises had no pain in his shoulders and arms prior to June 9, 2014 but has chronic, strong pains in his shoulders and arms since that day.

331. The level of restraint Belfort continually subjected Moises to for over seven and a half hours was unreasonable and not warranted by circumstances.

332. Moises did not consent to being detained, touched, and handcuffed by Belfort.

333. Moises was falsely imprisoned and battered from the moment Belfort illegally stopped him, and his rights were additionally violated under Article I, Sections 9 and 12 of the Florida Constitution, in that he was illegally seized, without due process.

334.    If Belfort's stop is found to be legal, then keeping him cuffed behind his back for over seven and a half hours nevertheless constitutes battery and excessive force, and his due process rights were also thereby violated under Article I, Section 9 of the Florida Constitution.

335.    Belfort further violated Moises's due process rights under Article I, Section 9 of the Florida Constitution by prohibiting Moises from using a toilet, despite his repeated requests over many hours, and by failing to feed him.

336.    Her keeping him in her car for so long without access to a bathroom and food was cruel and inhumane.

337.    City of Miami police department order 16.4.21.7 (valid through October 2013) states that "Stopping for prisoners to use toilet facilities or to eat is prohibited unless approved by a supervisor. Then, the facility will be chosen at random with security of the prisoner in mind." *See* Ex. D, Departmental Orders.

338.    Had Belfort dropped off Moises at TGK or kept him at a police station, Moises would have had access to a restroom, and lunch.

339.    Instead Belfort ignored his repeated requests, in English, to use the bathroom and made no attempt to get a supervisor's permission to take Moises to an external restroom or food vendor.

340.    Belfort's extended false imprisonment, battery, and excessive force caused Moises excruciating pain in his shoulders and arms, and also numbness.

341.    As a result of this false imprisonment, Moises continues to suffer chronic pain in his shoulders and arms.

342.    Moises did not have chronic pain in his shoulders and arms prior to June 9, 2014.

343.    As a result of Belfort's false imprisoning Moises, Moises was deported to Honduras, where his wages are significantly less than what he was earning at the time of his arrest on June 9, 2014. In Miami he was earning $5,500 to $6,000 per month installing marble and tile. Now in Honduras he earns $300 per month.

344.    Moises suffered indignity and humiliation in being falsely imprisoned and battered by Belfort, and by not being fed and allowed to use a toilet.

345.    In September 2014, pursuant to § 768.28, Fla. Stat., attorney John De Leon mailed to the City of Miami mayor and chief of police copies of a Notice of Intent to File a Claim on behalf of Moises against Officer Belfort and the City of Miami police department. *See* Ex. H, Notice of Intent to File a Claim.

346.    U.S. postal records indicate the notices were received. *See* Ex. H, U.S. Postal Delivery Confirmations.

347.    Moises is entitled to damages, including compensatory damages, actual damages, nominal damages, economic damages, damages for pain and suffering, reasonable attorney fees and court costs, and/or any other remedies the court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and all issues triable as of right.

## DESIGNATION OF EMAIL ADDRESSES

Pursuant to Florida Rule of Judicial Administration 2.516, undersigned attorneys designate the following email addresses for service of all documents required to be served in this proceeding:

| Joshua Tarjan, Esq. | | John de Leon, Esq. |
|---|---|---|
| josh@tarjanlawfirm.com | (primary) | jdeleon@chavez-deleon.com |
| joshtarjan@gmail.com | (secondary) | |

Dated this 7th day of June, 2018.

Respectfully submitted,

| | |
|---|---|
| */s/ Joshua Tarjan* | */s/ John De Leon* |
| The Tarjan Law Firm P.A. | John de Leon, Esq. |
| 12384 SW 82 Avenue | Chavez & De Leon P.A. |
| Pinecrest, FL 33156 | 12942 Ixora Road |
| (305) 423-8747 | North Miami, FL 33181 |
| (323) 243-3186 | (305) 778-0126 |
| (305) 402-0333 (fax) | (305) 778-0126 (cell) |
| josh@tarjanlawfirm.com | (305) 402-0333 (fax) |
| Co-counsel for Plaintiffs | jdeleon@chavez-deleon.com |
| Fla. Bar No. 107092 | Co-counsel for Plaintiffs |
| | Fla. Bar No. 650390 |

# Exhibit A



City of Miami
# POLICE DEPARTMENT
## VEHICLE STORAGE RECEIPT

City of Miami Police Department Vehicle Storage Facility: 400 N.W. 2nd Avenue, Miami, Florida 33130

| Claim Check No.: | Miami P.O. Case: 140609 - 168817 | Other Agency Case: |
|---|---|---|

| Date: 6/9/14 | Wrecker time on-scene: 0735 | Wrecker time left scene: | Notify CIS 24-hour desk, Ext. 6510. CIS IBM No. 2633  Date: 6/9/14 Time: 1300 |
|---|---|---|---|

Vehicle location before removal: 860 SW 7 St

**VEHICLE DESCRIPTION**

| Year: 2006 | Make: Mazda | Model: M3 | Type: 4DR | Color: BLK |
|---|---|---|---|---|

Destination of towed vehicle: Ted & Stan's

| Tag Number: PCb 55J | State: FL | Decal No.: — | Year: 04/30/15 |
|---|---|---|---|

Reason for towing vehicle: driver arrested

VIN No.: JM1BK324861505789

**BOAT INFORMATION**

| Year: | Make: | Size: | Color: | Registration No.: |
|---|---|---|---|---|

Serial No.:

### TOWING SERVICE AUTHORIZATION

|  | Initials | Time Used |
|---|---|---|
| Transmission linkage disconnect/connect | | |
| Dollies | | |
| Flatbed rate (when dollies needed) | | |
| Cable winching time | | |
| Waiting/working time (after first 30 mins.) | | |

**OPERATOR INFORMATION**

Name: Moises David Escoto Rojas
Address: 
City: Miami   State: FL   Incarcerated: ☑ Yes ☐ No

**REGISTERED OWNER**

Name: Molina Motors Inc
Address: PO Box 450148
City: Miami   State: FL   Verified by: ☑ Registration ☐ Title ☐ Record Check

**VEHICLE HOLD ORDER**

Authorizing Name & IBM No.:   Unit:   Date:   Year:

Reason for hold:

Vehicle Processed by:

### DAMAGED/MISSING VEHICLE PARTS

| | Damaged | Missing |
|---|---|---|
| Hood | ☐ | ☐ |
| Trunk | ☐ | ☐ |
| Fender(s) | ☐ | ☐ |
| Wheel(s) | ☐ | ☐ |
| Window(s) | ☐ | ☐ |
| Tire(s) | ☐ | ☐ |
| Battery | ☐ | ☐ |
| Alternator | ☐ | ☐ |
| Lights | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |

Circle area of vehicle damage
16 - Undercarriage
17 - Overturn
18 - Totaled

**ON-SCENE VEHICLE RELEASE**

Name:

Address:

Driver License No.:

### VEHICLE INVENTORY

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| Radio | ☐ | ☐ | Spare tire | ☐ | ☐ |
| Tape deck | ☐ | ☐ | Mag wheels | ☐ | ☐ |
| Mirrors | ☐ | ☐ | Hub caps | ☐ | ☐ |
| Fog lights | ☐ | ☐ | Key in ignition | ☐ | ☐ |
| Trunk locked | ☐ | ☐ | Ownership papers | ☐ | ☐ |

Personal property: misc clothing

**C.I.S. OFFICE USE ONLY**

CIS IBM NO.:

DATE:          TIME:

NCIC RESULTS:

FCIC RESULTS:

Evidence valuable property receipt No.:

WE, THE UNDERSIGNED OFFICER AND TOW TRUCK DRIVER, HEREBY CERTIFY THAT THE ABOVE LISTED JOINT PROPERTY INVENTORY IS CORRECT TO THE BEST OF OUR KNOWLEDGE.

| Towing firm's name: | Driver's name: |
|---|---|

| Impounding Officer: S. Belfort | IBM No.: 04399 |
|---|---|

D  PD/FO 814  Rev. 3/13   **Distribution:** White - Property & Evidence Bureau; Green - Auto Theft Unit; Canary - Garage; Pink - Officer's Copy; Goldenrod - Owner/Operator

# Exhibit B

**Affidavit in Support of Arrest Warrant**                    FILE FOR RECORD

2016 FEB 11  PM 2:05

Before me, _Richard Hersch_, a Judge of the Circuit Court of the Eleventh Judicial Circuit of Florida, personally appeared Detective Shanetta Green, of the City of Miami Police Department, who being by me first duly sworn deposes and says that he has probable cause to believe and does believe that a felony crime was committed in Miami-Dade County, Florida.

I am a police officer and investigator for the City of Miami Police Department.  I have been a police officer for approximately 7 years. I am currently assigned to the Internal Affairs Section Public Corruption Unit and have been assigned as Task Force Officer (T.F.O.) with the Federal Bureau of Investigation.  For the past three and a half (3 1/2) years I have conducted public corruption and criminal investigations, concerning violations of state and federal laws by public officials.

The information contained in this affidavit is based on my personal knowledge from my work on this investigation, and also on information provided to me by other law enforcement officers involved in this matter.  Because this affidavit is being submitted for the limited purpose of setting forth probable cause for the issuance of a criminal complaint, this affidavit does not contain all the information learned during this investigation.

In this capacity, I conducted an investigation into allegations of Impersonating a Police Officer and Grand Theft against **Maria Ilusion Cabrera Gonzalez,** herein referred to as Subject 1.  The investigation was initiated when your affiant learned that Mr. Moises Escoto filed a formal complaint against City of Miami Officer Sheila Belfort, badge number 4399. Mr. Escoto reported that on June 9, 2014, he was arrested by Officer Belfort and a second unknown plain clothes officer, later identified as Subject 1, for No Valid License, under City of Miami Police Case 140609-168817.

Mr. Escoto stated while he was in jail, Subject 1 demanded cash from his family, for the assistance with his release, which included bond, attorney fees, immigration issues and costs related to the arrest.

Mr. Escoto's family paid Subject 1 a total of $2,400 in U.S. Currency, with the hope and intent that these funds would be used in good faith to help Mr. Escoto with his release from jail and assistance with any immigration concerns.

**Initial Citizen Complaint to the City of Miami Police Department**

On June 10, 2014, Mr. Escoto and Ms. Emma Rojas (Mr. Escoto's mother), filed a formal citizen complaint with the City of Miami Police Department at the South District Sub-Station, herein referred to as the S.D.S.S. Mr. Escoto's allegation was that the arresting officer, Officer Sheila Belfort, who was wearing a City of Miami Police uniform, along with a white Cuban female officer (Subject 1), who was wearing plain clothes with a badge around her neck and a holstered firearm on her waist band, had stopped and arrested him for driving a motor vehicle without a valid license.

Judge's Initials _____        Page 1 of 11        Affiant's Initials _____        1

Mr. Escoto described that he was handcuffed and placed in the back seat of a City of Miami police vehicle, and was later driven by Officer Belfort along with Subject 1 to the S.D.S.S. Once they arrived at the S.D.S.S., Officer Belfort dropped off Subject 1 at a black Mercedes vehicle, which was parked at the S.D.S.S. Mr. Escoto stated that Subject 1 drove away in the black Mercedes and he was then transported by Officer Belfort to Turner Gilford Knight Detention Facility (T.G.K.).

Mr. Escoto stated that after he was released from jail, he was informed by his family that they had paid Subject 1 over $2,400 to assist with his release and immigration concerns.

On June 16, 2014, Mr. Escoto and Ms. Rojas went to the City of Miami Police Department Internal Affairs Section, to ensure the formal complaint was being investigated. During the complaint process Ms. Rojas provided phone #███████████, which was used by Subject 1 to communicate with her during the extortion.

## Internal Affairs Investigation

Internal Affairs investigators researched the activity for Officer Sheila Belfort for June 9, 2014 and discovered the following facts:

1. On June 9, 2014, City of Miami staffing sheet (P-Sheet) revealed Officer Belfort was assigned unit #7414.

2. The June 9, 2014 "P-Sheet" indicated that Officer Belfort was alone and that no plain clothes officer, or civilian was assigned to ride with her on that date.

3. On June 9, 2014, Officer Sheila Belfort generated a daily activity sheet (Worksheet), which listed her assigned police vehicle #29282. The worksheet did not indicate a second officer was assigned to ride with her on that date.

4. A copy of Arrest Affidavit for Moises Escoto was obtained and reviewed. Mr. Escoto's arrest affidavit indicated that he was arrested on June 9, 2014, under City of Miami Case #140609-168817, for No Valid License. The arrest affidavit indicated that Officer Belfort was the solitary arresting officer.

5. A review of the State of Florida Department Motor Vehicle records for Officer Belfort indicated that she was the owner of a 2010 black Mercedes, Florida Tag XXXX82.[1]

## Maria Ilusion Cabrera Gonzalez identified as Subject 1

Internal Affairs Investigators researched Officer Belfort and her black Mercedes and discovered she had multiple associations to a Maria Illusion Cabrera Gonzalez. Officer Belfort and Maria Ilusion Cabrera Gonzalez associations included:

1. A law enforcement report was processed using Shelia Belfort's name and the report revealed that Belfort shared an address[2] with Subject 1 beginning in March 2014.

2. The Department of Highway Safety and Motor Vehicles (DAVID) identification photo of Subject 1 matched the description provided by victims and witnesses.

3. On November 3, 2014, Ms. Emma Rojas and Mr. Rolando Muhlig were interviewed separately and shown photo lineups of females that matched the description previously

---

[1] Officer Belfort's personal vehicle tag information has not been disclosed due to confidentiality.
[2] Officer Belfort's personal address has not been disclosed due to confidentiality.

provided. Subject 1 was positively identified by Ms. Rojas and Mr. Muhlig as the plain clothes officer that was on the scene when Mr. Escoto was arrested.

4. Additionally, Ms. Rojas identified Subject 1 as "Officer Rosa," who was paid the $2,400 in U.S. currency for the purported assistance with Mr. Escoto's arrest.

5. On June 9, 2015, investigators observed Subject 1 driving Officer Belfort's black Mercedes as she arrived at the home shared with Officer Belfort.

**Ms. Emma Rojas statement**

On July 10, 2014, Sergeant Um Ramos obtained a sworn statement from Ms. Emma Rojas. The following is a summary of Ms. Rojas statement:

Ms. Rojas stated that Mr. Moises Escoto is her son. On the day of the incident Mr. Escoto left for work early in the morning. A short time later she received a phone call from Mr. Escoto, who told her that he was detained by the police and needed someone to pick up his car.

Ms. Rojas went to the arrest scene with Kathia Garmendia (her niece), and were driven there by a neighbor. When Ms. Rojas arrived on the scene she observed her son in the backseat of the police car. Ms. Rojas observed 2 female officers at the arrest scene. Ms. Rojas described a black female officer, who was wearing a police uniform and another female officer in plain clothes.

Ms. Rojas described the female plain clothes officer as a Latin, robust, about 160 pounds, with masculine features and she stated her name was "Officer Rosa."

Ms. Rojas spoke to the plain clothes officer multiple times about taking custody of Mr. Escoto's car. Ms. Rojas stated that she thought the plain clothes officer was Cuban because because of the type of accent she had. Ms. Rojas also stated that the plain clothes officer spoke Spanish.

Ms. Rojas stated that Mr. Escoto's car was towed away and then the police officers drove away in the police car, with Mr. Escoto in the back seat.

At that point a friend called, later identified as Maximo Gonzalez, and asked if Ms. Rojas if she need anything. Mr. Gonzalez was already aware of Mr. Escoto's arrest because Mr. Escoto had called him.

Mr. Gonzalez picked up Ms. Rojas and Ms. Garmendia from the arrest scene and was providing them with a ride to the jail on N.W. 36 Street. While they were driving, Ms. Rojas received a phone call from the plain clothes officer who was on the arrest scene.

The plain clothes officer told her to leave the jail and to meet her at a restaurant, located in Miami. Ms. Rojas then gave the phone to Ms. Garmendia, who also spoke to the plain clothes officer. Ms. Rojas stated at some point during the phone call, the plain clothes officer asked for $1,500 to assist with Mr. Escoto's arrest, which included assisting with his immigration. Ms. Rojas recalled that during the call the plain clothes officer stated that Mr. Escoto would be released from jail by 5 p.m.

Judge's Initials _____    Page 3 of 11    Affiant's Initials _____    3

Mr. Gonzalez then drove them to the restaurant, where they met with the same plain clothes officer from the arrest scene.

Mr. Gonzalez then left Ms. Rojas and Mrs. Garmendia and they entered the plain clothes officer's car, which she described a nice black car. The plain clothes officer engaged them about the payment and at some point in the car, they paid the initial $900 in U.S. Currency to the plain clothes officer.

Ms. Rojas stated that while in the car they spoke to Mr. Escoto's girlfriend on the phone about borrowing money to pay the remaining balance to the plain clothes officer.

Ms. Rojas and Ms. Garmendia later met with a friend of Mr. Escoto's girlfriend, who lent them $1,500 in U.S. Currency.

Ms. Rojas and Ms. Garmendia then paid the balance of the $1,500, which was $600 and at that point the plain clothes officer then demanded $1,000, more because Mr. Escoto had a fugitive warrant from the Keys and his case was complicated.  They paid the additional $900 that was left from the $1,500 that was borrowed.

Ms. Rojas stated that they paid a total of $2,400 cash to the plain clothes officer on the day of the Mr. Escoto's arrest.

The plain clothes officer then told Ms. Rojas that she owed $500 more to finish the payment for Mr. Escoto's assistance.

**Mr. Rolando Muhlig's statements**

On July 10, 2014, Sergeant Ramos obtained a sworn statement from Mr. Rolando Muhlig. The following is a summary of Mr. Muhlig's statement:

During this initial statement Mr. Muhlig concealed the fact that Officer Belfort had a plain clothes officer in the car.  Mr. Muhlig later explained he was not completely truthful because he was in fear of getting Officer Belfort in trouble.

On September 22, 2014, Sergeant Ramos obtained a secondary sworn statement from Mr. Rolando Muhlig.  The following is a summary of Mr. Muhlig's statement:

Mr. Muhlig stated when he arrived on the scene, Officer Belfort was observed standing outside of her vehicle. He stated that another female (Subject 1) was sitting inside of Officer Belfort's vehicle.

He stated Subject 1 came out of the vehicle and was speaking with two females who he believed to be relatives of Mr. Escoto. He stated that he believes that the females were asking Subject 1 a question.

Mr. Muhlig described Subject 1 as a chubby latin female, approximately 40 years old. He stated the female was wearing plain clothes, and that he did not notice her having a gun or badge. Mr. Muhlig stated that he did not recognize the female and had never seen her before.

Mr. Muhlig was shown a picture of Ms. Rojas but he did not recognize her. Mr. Muhlig was also shown a picture of Officer Belfort who he immediately recognized.

Sergeant Ramos provided Mr. Gonzalez a photo array of female City of Miami officers. The photo array produced negative results for Subject 1. (Note: At the time of the photo array Subject 1 had not been identified and therefore was not in the group of photographs.)

On November 3, 2014, Mr. Rolando Muhlig was interviewed and shown a photo lineup of females that matched the description that was previously provided. Subject 1 was positively identified by Mr. Muhlig as the plain clothes officer that was on the scene when Mr. Escoto was arrested.

## Mr. Maximo Gonzalez statement

On July 2, 2014, Sergeant Ramos obtained a sworn statement from Mr. Maximo Gonzalez. The following is a summary of Mr. Gonzalez's statement:

Sergeant Ramos provided Mr. Gonzalez a photo array of female City of Miami officers. The photo array produced negative results for Subject 1. (Note: At the time of the photo array Subject 1 had not been identified and therefore was not in the group of photographs.)

Mr. Gonzalez stated that he knows Mr. Escoto and Ms. Rojas from church. On June 9, 2014, he received a phone call from Mr. Escoto after he was arrested. Mr. Gonzalez then called Ms. Rojas to inform her that her son was arrested and he asked if she needed help. Mr. Gonzalez drove to the arrest location to pick up Ms. Rojas and Garmendia.

Mr. Gonzalez stated that when he arrived to the arrest scene, the officer had already departed the scene with Mr. Escoto. Mr. Gonzalez then was driving Ms. Rojas and Ms. Garmendia to a jail on N.W. 36 Street (T.G.K) when he was informed by Ms. Garmendia that he needed to take them to a restaurant on Flagler Street & 69 Avenue to meet with the officer.

When Mr. Gonzalez arrived at the restaurant with Ms. Rojas and Ms. Garmendia, they received another phone call from the female officer to come outside.

Mr. Gonzalez stated that he recalled he spoke to Subject 1 and described her as a plain clothes female officer. Mr. Gonzalez stated that Subject 1 was a Cuban officer and described her as heavy set, with grey hair, about 5'3 or 5'4, and she was wearing a hat, and she had a masculine demeanor. The female officer had a gun and when he spoke to the officer; and she told him she was Cuban.

Mr. Gonzalez stated that Ms. Rojas and Ms. Garmendia entered Subject 1's vehicle and he asked Subject 1 if she wanted him to follow and Subject 1 stated, "No." I will take them home.

Judge's Initials _____     Page 5 of 11     Affiant's Initials _____     5

Mr. Gonzalez found out the next day from Ms. Rojas that Subject 1 took them for about $3,000.00.

**Ms. Kathia Garmendia statement**

On August 6, 2014, Sergeant Ramos obtained a sworn statement from Ms. Kathia Garmendia. The following is a summary of Ms. Garmendia statement:

Sergeant Ramos provided Ms. Garmendia a photo array of female City of Miami officers. The photo array produced negative results for Subject 1. (Note: At the time of the photo array Subject 1 had not been identified and therefore was not in the group of photographs.)

Ms. Garmendia stated she was at home when received a phone call from Mr. Escoto. Mr. Escoto told her that he was stopped by the police close to their house and he requested for Ms. Garmendia to pick up his car. Ms. Garmendia stated that a neighbor brought her to the scene along with Mr. Escoto's mom (her aunt).

When Ms. Garmendia arrived she observed a police vehicle and tow truck on the scene. A plain clothes female officer (Subject 1) exited the front seat passenger side of the police vehicle and approached Ms. Garmendia. Ms. Rojas stated Subject 1 was wearing a police badge around her neck, which had a beaded chain.

Ms. Garmendia stated there was another officer sitting in the police vehicle. Ms. Rojas described Subject 1 as heavy set, white, older female, over 40 years old and less than 50 years old, Cuban, with grey hair and a mole on her face.

Ms. Garmendia provided Subject 1 with her passport and license. Subject 1 took her passport and license and entered the front passenger side of police vehicle. Ms. Garmendia stated the other officer in the car told Subject 1 to give the documents back to her.

Ms. Garmendia stated Subject 1 then entered the police vehicle and both officers drove away in the police vehicle.

Ms. Garmendia stated that they waited for William (Mr. Maximo Gonzalez) to pick them up to go to the jail. Ms. Rojas stated that when they arrived at the jail, when she received a call from Subject 1.

Ms. Garmendia stated that the call was from an unknown female who identified herself as the officer who they spoke to on the arrest scene. Ms. Garmendia stated that she recognized the caller's voice as the same plain clothes female officer (Subject 1), whom she spoke to from Mr. Escoto's arrest scene.

Subject 1 told Ms. Garmendia to meet her at a cafeteria so they talk about how Subject 1 could help them. Subject 1 stated they could not talk on the phone. Ms. Garmendia stated that Mr. Gonzalez then drove them to the cafeteria.

At the cafeteria, Ms. Garmendia met with Subject 1 who was in a newer model black Mercedes. Ms. Garmendia stated she entered the front passenger seat and Ms. Rojas sat in the rear seat. While in the black Mercedes Ms. Garmendia observed Subject 1 as she adjusted a black handgun in her waistband.

Ms. Garmendia stated that Subject 1 had two (2) cellular phones. Subject 1 told Ms. Garmendia that she just finished her shift from work.

Subject 1 then told Ms. Garmendia that she had a friend in the jail, and the friend could erase Mr. Escoto's information so he would not pass thru immigration. Subject 1 asked for money to assist Mr. Escoto's immigration case. Ms. Garmendia stated that Ms. Rojas handed over $900.00 in U.S. Currency to Subject 1, while in the Mercedes.

Subject 1 then asked for more money because Mr. Escotos' situation was more complicated.

Ms. Garmendia then borrowed money from Mr. Escoto's girlfriend and paid Subject 1 an additional $1,500.00 in U.S. Currency for a total of $2,400.00.

Ms. Garmendia and Ms. Rojas paid a toal of $2,400.00 to Subject 1 in exchange for the release of Mr. Escoto and for assistance with his immigration issues.

Subject 1 then called and showed up later at their apartment and demanded more money because Mr. Escoto had a warrant from the Monroe County. Subject 1 stated that Mr. Escoto would be released around midnight. Subject 1 was not given any more money and Subject 1 then departed the apartment.

Ms. Garmendia later discovered that Subject 1 did not pay the bond for Mr. Escoto. Ms. Rojas then called Subject 1. Subject 1 picked up the phone and told Ms. Garmendia that Mr. Escoto would be released and for her to be patient.

Ms. Garmendia stated that Mr. Escoto's girlfriend is the person who actually posted the bond for Mr. Escoto's release.

**Officer Shelia Belfort's statement**

On July 15, 2015, agents from the FBI interviewed Officer Sheila Belfort at the City of Miami South District Sub-Station. The following is a summary of her statement:

Officer Belfort stated that on June 9, 2014, she was on duty working as a patrol officer for the City of Miami Police Department and assigned to the South District. Officer Belfort admitted to owning a black Mercedes Benz, and on the day of the incident she allowed her live in girlfriend (later identified as Subject 1) to drive the Mercedes to the South District Sub-Station. Subject 1 parked the Mercedes at the South District Sub-Station and Officer Belfort picked up Subject 1, in her assigned marked City of Miami Police vehicle.

During the interview, the FBI Agents showed Officer Belfort a photograph of Subject 1. Officer Belfort identified Subject 1 and stated that she currently resides with and is involved in a Domestic relationship her.

Judge's Initials _____     Page 7 of 11     Affiant's Initials _____     7

Officer Belfort stated she drove from the South District Sub-Station and was heading to the bank with Subject 1, who was sitting in the front passenger seat, in the police vehicle. Officer Belfort then conducted a traffic stop on Mr. Moises Escoto, and subsequently arrested Mr. Escoto for traffic related charges.

Officer Belfort stated she allowed Subject 1 to assist her with the Spanish translation during the traffic stop with Mr. Escoto. Subject 1 also had interaction with the City of Miami rotation tow truck driver, later identified as Rolando Muhlig, responded to the traffic stop and towed Mr. Escoto's vehicle.

Officer Belfort stated that she was on the traffic stop location with Subject 1, for approximately one (1) hour. Officer Belfort then departed the traffic stop location with Subject 1 in the front passenger seat and Mr. Escoto, who was handcuffed in the backseat of the police vehicle.

Officer Belfort then drove to the South District Sub-Station and dropped off Subject 1 at the Mercedes Benz, which was parked at the South District Sub-Station. Officer Belfort then drove Mr. Escoto to the Miami-Dade Turner Gilford Knight Correctional Facility.

Officer Belfort informed the FBI Agents during the time of the incident in 2014 she allowed Subject 1 to ride in the City of Miami Police vehicle, while she was on duty. Officer Belfort explained she allowed Subject 1 to assist her with translations.

Officer Belfort claimed the day after the incident, on June 10, 2014, she was made aware that Mr. Escoto went to the South District Sub-Station and complained about the money taken from his family.

Officer Belfort stated that after she was made aware of the complaint she asked Subject 1 about the money allegation. Officer Belfort stated Subject 1 denied the allegation. Officer Belfort then informed Subject 1 she could no longer ride in the police vehicle with her.

Officer Belfort added that Subject 1 has a bad gambling problem and she has attempted to provide her professional assistance to help her with the gambling addiction.

Officer Belfort told the FBI Agents that she did not seek approval for Subject 1 to ride with her in the police vehicle and the City of Miami Police Department was unaware.

## Positive Identification of Subject #1

On November 3, 2014, FBI Special Agent (SA) Paul Wright and Internal Affairs Sergeant Ramos conducted a series of photographic line-ups, which included Subject #1, with witness Rolando Muhlig and Emma Rojas. Both witnesses were interviewed independently.

Ms. Rojas identified Subject #1 in the line-up as the officer that solicited and was paid the bribe money.

Mr. Muhlig identified Subject #1 in the line-up as the officer on the scene of the tow arrest involving Mr. Escoto.

## Subject 1's Phone Records

MetroPcs was subpoenaed for the subscriber information associated with mobile device number ███████████, and the following information was received. The account was established on March 31, 2014, by Mr. Peter Cabrera. Subject 1 has the same last name as the listed subscriber on the account "Cabrera."

## Call Pattern Analysis for Subject 1 phone # ██████████████

Subject 1's phone records from January 1, 2014, to November 20, 2014, were analyzed and the following was revealed:

On June 9, 2014, approximately 12 calls were exchanged between Subject 1 and Ms. Rojas, which totaled 23 minutes and 12 seconds. The initial call to Ms. Rojas regarding her son Moises Escoto was received at 9:35 a.m., for duration of 41 seconds.

On June 9, 2014, approximately 5 calls were exchanged between Subject 1 and Ms. Garmendia totaling 12 minutes and 43 seconds. The initial call from Ms. Garmendia to Subject 1 was at 9:23 a.m., and the duration of the call was 3 seconds.

Prior to June 9, 2014, phone records revealed that Subject 1 had no prior contact with Ms. Rojas or Mr. Escoto. Subject 1 made contact with Ms. Rojas for the first time on June 9, 2014, shortly after Mr. Escoto had been arrested by Officer Belfort.

## Subpoenaed Phone Records

MetroPcs was subpoenaed for the subscriber associated with mobile device number ██████████████, and the following information was received. The account was established on March 31, 2014, by Peter Cabrera. On June 9, 2014, Subject 1 used this phone to make contact with Ms. Rojas.

On September 2, 2014, a subpoena was sent to AT&T requesting subscriber information for the AT&T subscriber associated with mobile device number ‾

On October 9, 2014, Sherika Ralliford, an AT&T representative responded to the subpoena and provided the following information. The account was listed under the name Shelia Belfort and was established on April 23, 2013, and was associated with their wholesale partner, TracFone / Simple Mobile.

MetroPcs was subpoenaed for the subscriber associated with mobile device number ████████████, and the following information was received. The account was established on April 18, 2014, to Charlin Garmendia and Emma Herredia. On June 9, 2014, Subject 1 used this phone to contact Emma Rojas regarding her son Moises Escoto.

MetroPcs was subpoenaed for the subscriber associated with mobile device number ████████████, and the following information was received. December 2, 2013 and the listed subscriber is Mr. Escoto.

On October 3, 2014, a subpoena was sent to T-Mobile requesting the subscriber associated with the T-Mobile subscriber associated with mobile device number ███████████.

On October 16, 2014, Andrew Dios, a representative of T-Mobile responded to the subpoena and provided the following information. The account was established on May 5, 2014, and was associated with their wholesale partner, TracFone / Simple Mobile. This phone was used by Kathia Garmendia.

## On June 9, 2014, Officer Belfort Mercedes was documented in the City of Miami:

A police database that stores red light camera footage was analyzed and the following information was discovered: On June 9, 2014, at 6:56 pm, Officer Belfort's black Mercedes bearing Florida tag XXXX82[3] was located in the area of S.W. 16 Avenue and S.W. 8 Street. The location where the vehicle was captured by the red light camera was approximately 1.64 miles away from the home of Ms. Rojas.

## The Investigation Revealed The Following Facts:

On June 9, 2014, Mr. Moises David Escoto was stopped due to a traffic violation by Officer Shelia Belfort, and arrested for driving without a license. At the time of the arrest Subject 1 was riding as an unauthorized passenger in the front seat of Officer Belfort's marked City of Miami vehicle #29282.

Officer Belfort's statement supports the fact that Subject 1 was present during the traffic stop and arrest of Moises Escoto.

While inside of Officer Belfort's marked police vehicle Subject 1 had access to sensitive information and secured police databases. During the traffic stop and arrest of Mr. Escoto, Subject 1 impersonated a police officer by wearing a badge.

City of Miami records indicate that Subject 1 is not an employee with the City of Miami and is not a current or former police officer with the City of Miami.

At the S.D.S.S., Officer Belfort dropped Subject 1 to a black Mercedes, which was parked inside of the S.D.S.S. compound. Officer Belfort then transported Mr. Escoto to TGK.

Subject 1 made contact with Ms. Rojas on the telephone and identified herself as "Officer Rosa." A total of 12 telephone communications were exchanged between Subject 1 and Ms. Rojas on that date.

Subject 1 instructed Ms. Rojas not to go to the jail and to meet with her at a cafeteria close by the jail.

---

[3] Officer Belfort's personal vehicle tag information has been concealed for confidentiality.



Mr. Gonzalez drove Ms. Rojas and Ms. Garmendia to meet with Subject 1 at a restaurant near S.W. 69 Avenue and Flagler Street. At the meeting location Subject 1 arrived in a black Mercedes and wore plain clothes and he observed a gun.

Subject 1 introduced herself to Mr. Gonzalez as "Officer Rosa." Subject 1 had a brief conversation with Mr. Gonzalez before he departed. Subject 1 drove both Ms. Rojas and Ms. Garmendia back to Ms. Rojas's home where Subject 1 was then paid $900 in U.S. Currency.

After receiving the $900, Subject 1 demanded an additional money. Ms. Rojas borrowed the $1500 from Ms. Cristhiam Morales, who is a family friend, in order to pay Subject 1.

Ms. Morales provided her Chase bank statement showing a $1500 withdrawal from her savings account on June 9, 2014. Subject 1 was paid the additional $1500 in a subsequent meeting. Subject 1 was paid a total of $2400 from the victims.

Subject 1 impersonated a police officer by introducing herself to the victims as "Officer Rosa." Subject 1 did not assist Mr. Escoto with any bond or court proceedings. Subject 1 had no intent or means to prevent the deportation of Mr. Escoto.

Based on the foregoing, your Affiant believes that there is probable cause to believe that Subject 1, **Maria Ilusion Cabrera Gonzalez** committed the felony crimes of 1 count of Impersonating a Police Officer under Florida Statute FS 843.08, and 1 count of Grand Theft under Florida Statute FS 812.014.

WHEREFORE, your Affiant prays that this Court issue arrest warrants for the arrest of the following persons:

1. Maria Ilusion Cabrera Gonzalez.

Your Affiant, under oath, and subject to the penalties of perjury, states that the foregoing is true to the best of his knowledge.

Detective Shanetta Green
AFFIANT

Sworn to and subscribed before me on this _11_ day of February, 2016.

Circuit Judge
Eleventh Judicial Circuit of Florida

# Exhibit C

# City of Miami Police Department
# Departmental Orders
(Current through October 2013)

# Master Table of Contents

1. Office of the Chief

2. Internal Affairs Division

3. Special Investigations Section

4. Communications Section

5. Support Services Section

6. Personnel Resource Management Section

7. Community Relations Section

8. Business Management Section

9. Criminal Investigations Section

10. Office of Emer. Mgmt. & Homeland Security

11. Patrol

12. Specialized Operation Section

13. Information Technology Support Section

14. Property Section

16. Social Media – Social Networking

The following steps shall be followed:

1.   *Miranda* warnings are required and shall be administered prior to "custodial interrogation."

2.   *Miranda* warnings shall be read by officers from the card containing this information to all persons subjected to custodial interrogation.

3.   Officers shall ensure that suspects understand their right to remain silent and their right to an attorney.  Suspects may be interrogated only when they have knowingly and intelligently waived their rights.  Threats, false promises or coercion to induce suspect statements is prohibited.

    a.  Waivers of one or both of the *Miranda* rights must be understood clearly by the suspect.
    b.  Oral waivers are often sufficient but written waivers, particularly in felony charges, are preferred and should be obtained whenever possible on the appropriate form.

4.   When a suspect invokes his right to remain silent, all interrogation shall terminate immediately.

5.   Officers may interrogate a suspect who has previously invoked his right to silence, if, after the passage of time, the suspect initiates communication with officers.  However, prior to questioning, *Miranda* warnings shall be re-administered and a waiver obtained.

6.   Officers shall cooperate in any reasonable way with efforts by suspects to contact or meet with council.

7.   The circumstances surrounding the conduct of interrogations and recording of confessions shall be documented.

8.   The lead investigative officer may decide in which cases audio or video tape recordings may be appropriate and whether covert or overt procedures may be used.

**16.4  PROCEDURES:**  When a felony or misdemeanor arrest is made, the arresting officer shall:

**16.4.1**  Establish probable cause for the arrest.

**16.4.2**  All prisoners will be handcuffed with their hands behind their backs before transporting.  Any deviation must be approved by a supervisor or commanding officer.

**16.4.3**  Once a prisoner has been handcuffed, the following search procedures will be adhered to:

**16.4.3.1**  Prisoners shall be thoroughly searched by an officer of the same sex immediately following the arrest.

**16.4.3.2**  If a same sex officer is not available, an opposite sex officer, through necessity, may conduct a cursory pat down type search (witness should be present) for weapons or evidence.

**16.4.3.3**  If the arresting officer is not completely satisfied with the cursory search, the prisoner shall be handcuffed, hands behind back, and transported to the nearest station where a thorough search will be conducted.

**16.4.3.4**  Officers may search a prisoner's handbag or other items in their possession at the time of arrest.

**16.4.20.7**   An original arrest report for the escapee(s) will be available in the Warrant Management Detail until a Circuit Court Judge signs the warrant, should the escapee be arrested on probable cause.

**16.4.21**   **Transportation of Prisoners:**   Officers must adequately provide for the safe and secure transportation of prisoners, and in addition will adhere to the following procedures:

**16.4.21.1**   Officers must search prisoners prior to placing a prisoner in a police vehicle.  It cannot be assumed that a prisoner is free of weapons or contraband, even if previously searched.  The responsibility for the search is incumbent on the officer who places the prisoner in the police vehicle.

**16.4.21.2**   Prisoners will be transported directly to a police station or a Miami-Dade Jail or holding facility.  If there is a delay in transporting, or another destination, supervisory approval is required.

**16.4.21.3**   Vehicles used to transport prisoners are to be inspected at the beginning of each tour of duty to ensure that the vehicle is safe to operate and is properly equipped.

**16.4.21.4**   Officers are required to search the transport vehicle before and after transporting prisoners.

**16.4.21.4.1**  All vehicles used for transporting prisoners must have the driver separated from the prisoner by a clear safety barrier, which prevents the prisoner from having access to the driver's compartment.

**16.4.21.4.2**  Each patrol vehicle used for transporting prisoners must have the window cranks and door handles removed from the rear compartment.  The door release locks should operate from the front compartment or from the outside of the vehicle. This would minimize the opportunity for the prisoner to exit from the rear compartment.

**16.4.21.5**   Officers transporting prisoners will remain alert for violent behavior, illness, or attempts to escape.

**16.4.21.6**   If vehicles without cages are used to transport, the officer shall:

**16.4.21.6.1**   Place the prisoner in the right rear seat.

**16.4.21.6.2**  Position one officer in the rear seat with the prisoner.

**16.4.21.7**  Officers must not lose sight of prisoners while transporting.  Stopping for prisoners to use toilet facilities or to eat is prohibited unless approved by a supervisor.  Then, the facility will be chosen at random with security of the prisoner in mind.

**16.4.21.8**  Transporting officers will stop to respond to the need for law enforcement services only when the risk to third parties is both clear and grave, and the risk of injury to the prisoner or opportunity of escape is minimal.

**16.4.21.9**   Transporting officers may allow prisoners to talk to anyone as long as there are no safety or security concerns.

**16.4.21.10**   Prisoners will be transported by officers of the same sex whenever practicable.

**16.4.21.11**   When a prisoner must be transported by an officer of the opposite sex, the transporting officer will:

# Exhibit D

**COMPLAINT/ARREST AFFIDAVIT**

POLICE CASE NO. 140609-168817

SPECIAL OPERATION: _____

☐ FELONY ☐ MISD ☑ TRAFFIC ☐ JUV ☐ DV ☐ MOVES ☐ DIV INF
☐ WARRANT   FUGITIVE WARRANT: ☐ In state ☐ Out of state

AGENCY CODE: 01

GANG ACTIVITY RELATED ARREST ☑   FRAUD RELATED ARREST ☑

SIGNAL: ☐ 100 ☐ 150 ☐ 200 ☐ 300 ☐ 400 ☐ 500

DEFENDANT'S NAME (LAST, FIRST, MIDDLE): Escoto, Moises, David

DOB (MM/DD/YYYY): ████   AGE: 32   RACE: W   SEX: M   ☐ Hispanic ☐ Not Hispanic ETHNICITY: HIS   HEIGHT: 5'5"   WEIGHT: 140   HAIR COLOR: BLC   HAIR LENGTH: SHT   HAIR STYLE: AFR   EYES: BROWN   GLASSES ☐ Yes   FACIAL HAIR: ___   TEETH: WL WHITE

SCARS, TATTOOS, UNIQUE PHYSICAL FEATURES: none visible   PLACE OF BIRTH: Honduras

LOCAL ADDRESS: ████   CITY: Miami, FL   ZIP: 33130   PHONE: ████   CITIZENSHIP: Honduras

PERMANENT ADDRESS: ████ ☐ HOMELESS ☐ UNKNOWN

WEAPON SEIZED? ☐ Yes ☑ No Type: N/A

SOCIAL SECURITY NO.: N/A

ARREST DATE: 06/09/2014   ARREST TIME: 0745   ARREST LOCATION: SW 8 Ave/7 St

CHARGES: NVDL   CHARGE AS: ☑ F.S. ☐ ORD   COUNTS: 1   FL STATUTE NUMBER: 322.03( )   CASE #: A1AAFNP

The undersigned certifies and swears that he/she has just and reasonable grounds to believe, and does believe that the above named Defendant committed the following violation of law:

On the 09 day of June 2014 at 0730 (HHMM) at SW 8 Ave/7 St

I observed the def driving a 2006 Mazda M3 black 4Dr tag #PCb 55I travelling westbound on SW 8 Ave/7 St. The def was stopped for changing lanes without signal, almost causing an accident summons #A1AAFNP. The def was asked to produce a driver license. At that time, the def stated "Officer I don't have a driver license. I am waiting on my papers" and handed me a Honduras Passport. The def also stated to me that he has previous tickets for driving without driver license which he paid for the tickets and he has been in the United States for 9 years. A computer check revealed the def do not have a valid driver license. The def was arrested and transp to TGK

OFFICER'S / COMPLAINT'S SIGNATURE: ____   COURT ID NUMBER/LOC. CODE: 0439066
NAME (Printed): Sheila Belfort   AGENCY NAME: A-66 MPD

32.02 09-9  Rev. 04/08

# FLORIDA UNIFORM TRAFFIC CITATION

A1A77PP

☐ (1) F.H.P.  ☐ (2) P.D.  ☐ (3) S.O.  ☐ (4) OTHER

COUNTY OF MIAMI-DADE
CITY (IF APPLICABLE) MIAMI

AGENCY NAME MIAMI-POLICE
AGENCY # Ga-WPL

IN THE COURT DESIGNATED BELOW, THE UNDERSIGNED CERTIFIES THAT HE/SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT ON

**SUMMONS** (VIOLATOR'S COPY)

| DAY OF WEEK | MONTH | DAY | YEAR | | |
|---|---|---|---|---|---|
| Mon | 06 | 19 | 14 | 8:00 | ☑AM ☐PM |

NAME (PRINT) FIRST: David   MIDDLE: E   LAST: Jefferson

STREET ███████████

| CITY | STATE | ZIP CODE |
|---|---|---|
| Miami | Fl | 33___ |

| TELEPHONE NUMBER | DATE OF BIRTH | RACE | SEX | HGT |
|---|---|---|---|---|
| | | ___ | M | 5'5 |

DRIVER LICENSE NUMBER ███████████

STATE | CLASS | CDL LICENSE ☐YES ☐NO | YR LICENSE EXP. | COMMERCIAL VEHICLE ☐YES ☐NO | PLACARDED HAZARDOUS MATERIAL ☐YES ☐NO

| YR. VEHICLE | MAKE | TYPE | COLOR |
|---|---|---|---|
| | Mazda | M3 4 | |

VEHICLE LICENSE NO. | TRAILER TAG NO. | STATE Fl | YEAR TAG EXPIRES | ☐ ≥ 16 PASSENGERS
☐ MOTORCYCLE ☐YES ☐NO

UPON A PUBLIC STREET OR HIGHWAY, OR OTHER LOCATION, NAMELY

COMPANION CITATION NUMBER(S)

___ FT. ___ MILES ☐N ☐S ☐E ☐W OF NODE

## DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE. CHECK ONLY ONE OFFENSE EACH CITATION.

☐ UNLAWFUL SPEED ___ MPH SPEED APPLICABLE ___ MPH
☐ INTERSTATE ☐ SCHOOL ZONE ☐ CONSTRUCTION WORKERS PRESENT
SPEED MEASUREMENT DEVICE: ___

☐ CARELESS DRIVING
☐ VIOLATION OF TRAFFIC CONTROL DEVICE
☐ FAILURE TO STOP AT A TRAFFIC SIGNAL
☐ IMPROPER LANE CHANGE OR COURSE
☑ NO PROOF OF INSURANCE
☐ VIOLATION OF RIGHT-OF-WAY
☐ IMPROPER PASSING

☐ CHILD RESTRAINT
☐ SAFETY BELT VIOLATION
☐ IMPROPER OR UNSAFE EQUIPMENT
☐ EXPIRED TAG SIX (6) MONTHS OR LESS
☐ EXPIRED TAG MORE THAN SIX (6) MONTHS
☐ DRIVING WHILE LICENSE SUSPENDED OR REVOKED

☐ EXPIRED DRIVER LICENSE SIX (6) MONTHS OR LESS
☐ EXPIRED DRIVER LICENSE MORE THAN SIX (6) MONTHS
☐ NO VALID DRIVER LICENSE
☐ DRIVING UNDER THE INFLUENCE
☐ Passenger Under 18 Yrs.

OTHER VIOLATIONS OR COMMENTS PERTAINING TO OFFENSE:
No proof of insurance

BAL ___

PRE - EXAM ☐YES ☑NO
DL SEIZED ☐YES ☐NO
OL SEIZED ☐YES ☑NO

☐ AGGRESSIVE DRIVING   IN VIOLATION OF STATE STATUTE 316.646(1) | SECTION | SUB-SECTION

| CRASH ☐YES ☑NO | PROPERTY DAMAGE ☐YES ☐NO | INJURY TO ANOTHER ☐YES ☐NO | SERIOUS BODILY INJURY TO ANOTHER ☐YES ☐NO | FATAL ☐YES ☐NO |
|---|---|---|---|---|

☐ CRIMINAL VIOLATION, COURT APPEARANCE REQUIRED AS INDICATED BELOW:
☐ INFRACTION, COURT APPEARANCE REQUIRED AS INDICATED BELOW:
☐ INFRACTION WHICH DOES NOT REQUIRE APPEARANCE IN COURT.

CIVIL PENALTY IS $ ___

A1A77PP

COURT INFORMATION
DATE ___ TIME M T S
COURT 13 st NW 12 St
LOCATION MIAMI Fl

ARREST DELIVERED TO ___ DATE ___

I AGREE AND PROMISE TO COMPLY AND APPEAR TO THE CHARGES AND INSTRUCTIONS SPECIFIED IN THIS CITATION. WILLFUL REFUSAL TO ACCEPT AND SIGN THE CITATION MAY RESULT IN ARREST. I UNDERSTAND MY SIGNATURE IS NOT AN ADMISSION OF GUILT OR WAIVER OF RIGHTS. IF YOU NEED REASONABLE FACILITY ACCOMMODATIONS TO COMPLY WITH THIS CITATION, CONTACT THE CLERK OF THE COURT.

X SIGNATURE (IF VIOLATOR IS UNDER 18, THE SIGNED BY A LEGAL GUARDIAN) SIGNATURE (IF INFRACTION REQUIRES APPEARANCE IN COURT)

RANK, NAME OF OFFICER ___ BADGE NO. N4391 | ID. NO. | TROOP UNIT 0405

I CERTIFY THAT THIS CITATION WAS DELIVERED TO THE PERSON CITED ABOVE AND CERTIFY THE CHARGE ABOVE.

HSMV 73901 (Rev. 07/12)

# FLORIDA UNIFORM TRAFFIC CITATION

## A1AAFNP

COUNTY OF Miami Dade

☐ (1) F.H.P. ☒ (2) P.D. ☐ (3) S.O. ☐ (4) OTHER

AGENCY NAME Miami Police

CITY OF APPLICABLE Miami

AGENCY # Q-Ldo MPD

### SUMMONS (VIOLATOR'S COPY)

IN THE COURT DESIGNATED BELOW THE UNDERSIGNED CERTIFIES THAT HE/SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT ON

| DAY OF WEEK | MONTH | DAY | YEAR | TIME |
|---|---|---|---|---|
| Mon | 09 | 9 | | 8:00 ☒AM ☐PM |

NAME (PRINT) FIRST ___ Moises ___ MIDDLE David ___ LAST ___ Escoto Ponces

☒ FL OR DRIVER LICENSE IS HERE X

| STREET | | | |
|---|---|---|---|
| CITY Miami | STATE FL | ZIP CODE 33130 | |

TELEPHONE NUMBER ___ DATE OF BIRTH ___ RACE H SEX M HGT 5-5

DRIVER LICENSE NUMBER ___ STATE ___ CLASS ___ CDL LICENSE ☐YES ☐NO ___ YR. LICENSE EXP. ___ COMMERCIAL VEHICLE ☐YES ☐NO

VEH. VEHICLE ___ MAKE Mazda ___ STYLE M3 4 DR ___ COLOR BLC ___ PLACARDED HAZARDOUS MATERIAL ☐YES ☐NO

VEHICLE LICENSE NO. ___ STATE FL ___ YEAR TAG EXPIRES ___ ≥ 16 PASSENGERS ☐YES ☐NO

TRAILER TAG NO. ___ STATE ___ YEAR TAG EXPIRES ___ MOTORCYCLE ☐YES ☐NO

UPON A PUBLIC STREET OR HIGHWAY, OR DRIVER LOCATION, NAMELY ___ Sw 8 Ave / 7 St ___ COMPANION CITATION NUMBER(S) ☐YES ☐NO

FT. ___ MILES ___ ☐N ☐S ☐E ☒W OF NODE

## DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE. CHECK ONLY ONE OFFENSE EACH CITATION.

☐ UNLAWFUL SPEED ___ MPH SPEED APPLICABLE ___ MPH

☐ INTERSTATE ☐ SCHOOL ZONE ☐ CONSTRUCTION WORKERS PRESENT

SPEED MEASUREMENT DEVICE ___

☐ CARELESS DRIVING ☐ CHILD RESTRAINT ☐ EXPIRED DRIVER LICENSE
☐ VIOLATION OF TRAFFIC CONTROL DEVICE ☐ SAFETY BELT VIOLATION ☐ SIX (6) MONTHS OR LESS
☐ FAILURE TO STOP AT A TRAFFIC SIGNAL ☐ IMPROPER OR UNSAFE EQUIPMENT ☐ EXPIRED DRIVER LICENSE
☐ IMPROPER LANE CHANGE OR COURSE ☐ EXPIRED TAG SIX (6) MONTHS OR LESS ☐ MORE THAN SIX (6) MONTHS
☐ NO PROOF OF INSURANCE ☐ EXPIRED TAG MORE THAN SIX (6) MONTHS ☒ NO VALID DRIVER LICENSE
☐ VIOLATION OF RIGHT-OF-WAY ☐ DRIVING WHILE LICENSE ☐ DRIVING UNDER THE INFLUENCE
☐ IMPROPER PASSING ☐ SUSPENDED OR REVOKED ☐ Passenger Under 18 Yrs.
BAL ___

OTHER VIOLATIONS OR COMMENTS PERTAINING TO OFFENSE. ___ NVDL at time of stop

RE - EXAM ☐YES ☐NO
DL SEIZED ☐YES ☐NO

☐ AGGRESSIVE DRIVING ☐YES ☒NO ___ IN VIOLATION OF STATE STATUTE 322.03(1) ___ SECTION ___ SUB-SECTION ___

| CRASH ☐YES ☒NO | PROPERTY DAMAGE ☐YES $___ | INJURY TO ANOTHER ☐YES ☐NO | SERIOUS BODILY INJURY TO ANOTHER ☐YES ☒NO | FATAL ☐YES ☒NO |

☐ CRIMINAL VIOLATION, COURT APPEARANCE REQUIRED AS INDICATED BELOW.

☐ INFRACTION, COURT APPEARANCE REQUIRED AS INDICATED BELOW.

☐ INFRACTION WHICH DOES NOT REQUIRE APPEARANCE IN COURT.

CIVIL PENALTY IS $ ___

## A1AAFNP

COURT INFORMATION ___ DATE ___ TIME ___

COURT ___ MPD

12-11-12-8

LOCATION Miami Fl

ARREST DELIVERED TO ___ DATE ___

I AGREE AND PROMISE TO COMPLY AND ANSWER TO THE CHARGES AND INSTRUCTIONS SPECIFIED IN THIS CITATION. WILLFUL REFUSAL TO ACCEPT AND SIGN THE CITATION MAY RESULT IN ARREST. I UNDERSTAND MY SIGNATURE IS NOT AN ADMISSION OF GUILT OR WAIVER OF RIGHTS. IF YOU NEED REASONABLE FACILITY ACCOMMODATIONS TO COMPLY WITH THIS CITATION, CONTACT THE CLERK OF THE COURT.

X IS A COURSE OF VIOLATOR'S SIGNATURE & PROCEDURE / INFRACTION REQUIRES APPEARANCE IN COURT ___ 7/9/15

RANK - NAME OF OFFICER ___ BADGE NO. ___ ID. CO. ___ TROOP UNIT ___

I CERTIFY THIS CITATION WAS DELIVERED TO THE PERSON CITED ABOVE AND CERTIFY THE CHARGE ABOVE.

HSMV 75001 (Rev. 07/12)

FLORIDA UNIFORM TRAFFIC CITATION          **A1A77QP**

| COUNTY OF | (1) F.H.P. | (2) P.D. | (3) S.O. | (4) OTHER |
| Miami-Dade | AGENCY NAME | Miami-Police | | |
| CITY (IF APPLICABLE) | | | | |
| Miami | AGENCY # | Hdo-MPD | | |

IN THE COURT DESIGNATED BELOW THE UNDERSIGNED CERTIFIES THAT HE/SHE
HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT ON

**SUMMONS**
(VIOLATOR'S COPY)

| DAY OF WEEK | MONTH | DAY | YEAR | |
| Mon | 06 | 18 | 12 | 8:00 ☐ A.M. ☐ P.M. |

NAME (PRINT) FIRST      MIDDLE      LAST
Moises   Dania   Escano   ____

STREET ████████████████

| CITY | STATE | ZIP CODE |
| MIAMI | FL | 3335 |

| TELEPHONE NUMBER | DATE OF BIRTH | RACE | SEX | HGT | WT |
| | ████ | W | M | | 55 |

| DRIVER LICENSE NUMBER | STATE | CLASS | CDL LICENSE ☐YES ☐NO | YR LICENSE EXP. | COMMERCIAL VEHICLE ☐YES ☐NO |
| | | | | | |

| YR VEHICLE | MAKE | STYLE | COLOR | PLACARDED HAZARDOUS MATERIAL ☐YES ☐NO |
| | TVarna | M3 | Blk | |

| VEHICLE LICENSE NO. | TRAILER TAG NO. | STATE | YEAR TAG EXPIRES | ≥ 16 PASSENGERS ☐YES ☐NO |
| | | FLMD | | |

UPON A PUBLIC STREET OR HIGHWAY, OR OTHER LOCATION, NAMELY          MOTORCYCLE ☐YES ☐NO

| | COMPANION CITATION NUMBERS ☐YES ☐NO |
| FT. ____ MILES ____ ☐N ☐S ☐E ☐W OF MILE | |

**DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE. CHECK ONLY ONE OFFENSE EACH CITATION.**

☐ UNLAWFUL SPEED _____ MPH SPEED APPLICABLE _____ MPH
( ☐ INTERSTATE ☐ SCHOOL ZONE ☐ CONSTRUCTION WORKERS PRESENT)
SPEED MEASUREMENT DEVICE: _____

| ☐ CARELESS DRIVING | ☐ CHILD RESTRAINT | ☐ EXPIRED DRIVER LICENSE SIX (6) MONTHS OR LESS |
| ☐ VIOLATION OF TRAFFIC CONTROL DEVICE | ☐ SAFETY BELT VIOLATION | |
| ☐ FAILURE TO STOP AT A TRAFFIC SIGNAL | ☐ IMPROPER OR UNSAFE EQUIPMENT | ☐ EXPIRED DRIVER LICENSE MORE THAN SIX (6) MONTHS |
| ☐ IMPROPER LANE CHANGE OR COURSE | ☐ EXPIRED TAG SIX (6) MONTHS OR LESS | |
| ☐ NO PROOF OF INSURANCE | ☐ EXPIRED TAG MORE THAN SIX (6) MONTHS | ☐ NO VALID DRIVER LICENSE |
| ☐ VIOLATION OF RIGHT-OF-WAY | ☐ DRIVING WHILE LICENSE SUSPENDED OR REVOKED | ☐ DRIVING UNDER THE INFLUENCE |
| ☐ IMPROPER PASSING | | ☐ Passenger Under 18 Yrs. |

| OTHER VIOLATIONS OR COMMENTS PERTAINING TO OFFENSE: | RE - EXAM ☐YES ☐NO |
| Tag Not assigned to vehicle | DL SEIZED ☐YES ☐NO |
| | BAL _____ |

| ☐ AGGRESSIVE DRIVING | IN VIOLATION OF STATE STATUTE | SECTION 320-5b1 | SUB-SECTION |

| CRASH ☐YES ☐NO | PROPERTY DAMAGE ☐YES ☐NO | INJURY TO ANOTHER ☐YES ☐NO | SERIOUS BODILY INJURY TO ANOTHER ☐YES ☐NO | FATAL ☐YES ☐NO |

☐ CRIMINAL VIOLATION, COURT APPEARANCE REQUIRED, AS INDICATED BELOW.
☐ INFRACTION, COURT APPEARANCE REQUIRED, AS INDICATED BELOW.
☐ INFRACTION WHICH DOES NOT REQUIRE APPEARANCE IN COURT.

CIVIL PENALTY IS $ _____

**A1A77QP**

| COURT INFORMATION | DATE | TIME |
| | MTB | _____ |
| COURT | 151 NW 12 St | |
| LOCATION | Miami FL | |

ARREST DELIVERED TO: _____      DATE _____

I AGREE AND PROMISE TO COMPLY AND ANSWER TO THE CHARGES AND INSTRUCTIONS SPECIFIED IN THIS CITATION. MY/OUR REFUSAL TO ACCEPT AND SIGN THIS CITATION MAY RESULT IN ARREST. I UNDERSTAND MY SIGNATURE IS NOT AN ADMISSION OF GUILT OR WAIVER OF RIGHTS. IF YOU NEED REASONABLE FACILITY ACCOMMODATIONS TO COMPLY WITH THIS CITATION, CONTACT THE CLERK OF THE COURT.

X SIGNATURE OF VIOLATOR. MY SIGNATURE IS REQUIRED IF INFRACTION REQUIRES APPEARANCE. 04-911   6/1/15

| RANK - NAME OF OFFICER | BADGE NO. | I.D. NO. | TROOP DIST. |
I CERTIFY THIS CITATION WAS DELIVERED TO THE PERSON CITED ABOVE AND CERTIFY THE CHARGE ABOVE

HSMV 75901 (Rev. 07/12)

A1AAFMP

**FLORIDA UNIFORM TRAFFIC CITATION**

COUNTY OF Miami-Dade
CITY (IF APPLICABLE) Miami

☐ (1) F.H.P.  ☑ (2) P.D.  ☐ (3) S.O.  ☐ (4) OTHER
AGENCY NAME MIAMI POLICE
AGENCY # 01-66 MPD

IN THE COURT DESIGNATED BELOW THE UNDERSIGNED CERTIFIES THAT HE/SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE AND DOES BELIEVE THAT ON

**SUMMONS**
(VIOLATOR'S COPY)

DAY OF WEEK MON  MONTH 06  DAY 09  YEAR 14  8:00  ☐ A.M. ☐ P.M.

NAME (PRINT) FIRST Moises David  MIDDLE Escoto  LAST Rods  ☐ IF DIFFERENT THAN ON DRIVER LICENSE "X" HERE

STREET ███████████████

CITY Miami  STATE FL  ZIP CODE 33130

TELEPHONE NUMBER  DATE OF BIRTH ███████  RACE H  SEX M  HGT 5-5

DRIVER LICENSE NUMBER NONE  STATE  CLASS  CDL LICENSE ☐ YES ☐ NO  VR LICENSE EXP. ☐ YES ☐ NO  COMMERCIAL VEHICLE ☐ YES ☑ NO

YR. VEHICLE 2016  MAKE Mazda M3  STYLE  COLOR BLK  PLACARDED HAZARDOUS MATERIAL ☐ YES ☐ NO

VEHICLE LICENSE NO. FL  TRAILER TAG NO.  STATE FL  YEAR TAG EXPIRES  ☐ 16 PASSENGERS ☐ YES ☐ NO

UPON A PUBLIC STREET OR HIGHWAY, OR OTHER LOCATION, NAMELY  MOTORCYCLE ☐ YES ☐ NO

80 R Ave 7 St  COMPANION CITATION NUMBER(S)

FT. ___ MILES ___  ☐ N ☐ S ☐ E ☐ W OF/NODE ___

**DID UNLAWFULLY COMMIT THE FOLLOWING OFFENSE.  CHECK ONLY ONE OFFENSE EACH CITATION.**

☐ UNLAWFUL SPEED ___ MPH SPEED APPLICABLE ___ MPH

☐ INTERSTATE  ☐ SCHOOL ZONE  ☐ CONSTRUCTION WORKERS PRESENT

SPEED MEASUREMENT DEVICE: ___

☐ CARELESS DRIVING  ☐ CHILD RESTRAINT  ☐ EXPIRED DRIVER LICENSE
☐ VIOLATION OF TRAFFIC CONTROL DEVICE  ☑ SAFETY BELT VIOLATION  ☐ SIX (6) MONTHS OR LESS
☐ FAILURE TO STOP AT A TRAFFIC SIGNAL  ☐ IMPROPER OR UNSAFE EQUIPMENT  ☐ EXPIRED DRIVER LICENSE MORE THAN SIX (6) MONTHS
☐ IMPROPER LANE CHANGE OR COURSE  ☐ EXPIRED TAG SIX (6) MONTHS OR LESS  ☐ NO VALID DRIVER LICENSE
☐ NO PROOF OF INSURANCE  ☐ EXPIRED TAG MORE THAN SIX (6) MONTHS  ☐ DRIVING UNDER THE INFLUENCE
☐ VIOLATION OF RIGHT-OF-WAY  ☐ DRIVING WHILE LICENSE  ☐ Passenger Under 18 Yrs.
☐ IMPROPER PASSING  ☐ SUSPENDED OR REVOKED  BAL ___

OTHER VIOLATIONS OR COMMENTS PERTAINING TO OFFENSE:
Fail to use signl when
Changing lanes Almost crashing
on Incident

RE-EXAM ☐ YES ☐ NO
DL SEIZED ☐ YES ☐ NO

☐ AGGRESSIVE DRIVING  IN VIOLATION OF STATE STATUTE 316.9(17)  SECTION ___  SUB-SECTION ___

CRASH ☐ YES ☑ NO  PROPERTY DAMAGE ☐ YES $ ___  INJURY TO ANOTHER ☐ YES ☑ NO  SERIOUS BODILY INJURY TO ANOTHER ☐ YES ☑ NO  FATAL ☐ YES ☑ NO

☐ CRIMINAL VIOLATION. COURT APPEARANCE REQUIRED, AS INDICATED BELOW.
☐ INFRACTION, COURT APPEARANCE REQUIRED, AS INDICATED BELOW.
☐ INFRACTION WHICH DOES NOT REQUIRE APPEARANCE IN COURT.

CIVIL PENALTY IS $ ___

A1AAFMP

COURT INFORMATION  DATE ___  TIME MTB
COURT 1351 NW 12 St
LOCATION Miami FL

ARREST DELIVERED TO ___  DATE ___
I AGREE AND PROMISE TO COMPLY AND ANSWER TO THE CHARGES AND INSTRUCTIONS SPECIFIED ON THIS CITATION. WILFUL REFUSAL TO ACCEPT AND SIGN THE CITATION MAY RESULT IN ARREST. I UNDERSTAND MY SIGNATURE IS NOT AN ADMISSION OF GUILT OR WAIVER OF RIGHTS. IF YOU NEED REASONABLE FACILITY ACCOMMODATIONS TO COMPLY WITH THIS CITATION, CONTACT THE CLERK OF THE COURT.

X ___ SIGNATURE OF VIOLATOR IF SIGNATURE IS REQUIRED IF INFRACTION REQUIRES APPEARANCE IN COURT  N309  11/0/15

RANK-NAME OF OFFICER ___  BADGE NO. ___  ID. NO. ___  TROOP UNIT ___
I CERTIFY THIS CITATION WAS DELIVERED TO THE PERSON CITED ABOVE AND CERTIFY THE CHARGE ABOVE.
HSMV 75001 (Rev. 07/12) ➤

Printed by: 01600
Printed date/time:  10/23/14 8:33

# Incident Report

Page 1 of 3

**CITY OF MIAMI POLICE DEPARTMENT**
400 NW 2 AVENUE
MIAMI, FLORIDA 33128
(305) 579-6111

**Incident Number: 140609-168817**

## Incident Summary

| | | |
|---|---|---|
| **Incident Type:** TRAFFIC VIOLATION | | **Report Type:** ARREST |
| **Inc Occurred Address:** SW 7TH ST&SW 8TH AV, MIAMI, FLORIDA | | **Sector/Beat:** 73/P734 |
| **Inc Occurred Start:** 06/09/2014 07:45 | **Inc Occurred End:** 06/09/2014 07:45 | **Report Taken:** |
| **Domestic:** N | **Bias Motivation:** | **Gang Related:** N | **Substance:** U |
| **Contact Nature:** | | **Reported Date/Time:** 06/09/2014 07:14 |
| **Reporting Officer:** BELFORT, SHEILA | **Primary Assigned Officer:** | |
| **Case Status:** CLOSED - ADULT A **Disposition:** CLOSED BY ARREST - ADULT | | **Disposition Date:** 06/09/2014 07:45 |

### Offenses

**Statute Code:** 322.03(1)      **Enhancers:**
**Statute Desc:** DRIVER LICENSE OPERATING MOTOR VEHICLE WITHOUT
**Counts:** 1   **Statute Severity:** NON-CRIMINAL\NON-CRIMINAL

### Officers

| Event Association | Emp# | Badge# | Name | Squad# |
|---|---|---|---|---|
| REPORTING OFFICER | 04399 | 04399 | BELFORT, SHEILA | |
| Primary Responding Officer | 04399 | 04399 | BELFORT, SHEILA | |

## Persons Involved

| | | |
|---|---|---|
| **Person#:** 0001 | **MNI:** 895594 | **Can ID Suspect:** No |
| **Event Association:** ARRESTEE | **Contact Date/Time:** 06/09/2014 07:45 | |
| **Name:** ESCOTO ROJAS, MOISES DAVID | | |
| **SSN:** | **DOB:** ▓▓▓▓▓ **Age:** 32 - 32 **Sex:** MALE | **Race:** WHITE |
| **Height:** 5' 5" - 5' 5" | **Weight:** 140 - 140 lbs **Eye Color:** BROWN | **Hair Color:** BLACK |
| **Address:** ▓▓▓▓▓ | | **Sector/Beat:** 44/P742 |
| **Phone Type 1:** MOBILE | **Phone# 1:** ▓▓▓▓▓ **Ext 1:** | |
| **Phone Type 2:** | **Phone# 2:** **Ext 2:** | |
| **DL State:** | **DL#:** **DL Exp. Date:** | |
| **Occupation:** | **Employer/School:** | |

### Characteristics

| Characteristic Type: | Further Defined By: | Description: |
|---|---|---|
| HAIR LENGTH | SHORT | |
| HAIR STYLE | AFRON/NATURAL | |
| FACIAL HAIR | LOWER LIP | |
| COMPLEXION | MEDIUM | |
| TEETH | VERY WHITE | |
| APPEARANCE / DEMEAN | CALM | |
| R/L HANDED | RIGHT | |
| BUILD | MEDIUM | |
| CLOTHING | | BLACK T-SHIRT,GRAY SHIRT |

### Person Offenses

**Statute Code:** 322.03(1)      **Enhancers:**
**Statute Desc:** DRIVER LICENSE OPERATING MOTOR VEHICLE WITHOUT
**Counts:** 1

Printed by: 01600
Printed date/time:  10/23/14 8:33

# Incident Report

**CITY OF MIAMI POLICE DEPARTMENT**
**400 NW 2 AVENUE**
**MIAMI, FLORIDA 33128**
**(305) 579-6111**

**Incident Number: 140609-168817**

## Vehicles Involved

| | | | |
|---|---|---|---|
| Vehicle#:  0001 | | | |
| Event Assoc:  USED IN CRIME | | Vehicle Status: | |
| Vehicle Type:  A | Year:  2006 | Make: MAZDA | Model: M3 |
| VIN: JM1BK324861505789 | License#:   PC655D | State: FL | Expires On: |
| Style:  AUTOMOBILE | Prim Color:  BLACK | Sec Color:  BLACK | Ter Color: |
| Status Dt/Tm: | Status Value: | Recovered Date: | Recovered Value: |
| NCIC Date: | | NCIC Reported By: | |
| NCIC#: | | NCIC Cancelled: | |

Registered Owner   Name: MOLINA MOTORS INC
Address: PO BOX 450948  MIAMI/FL        Phone#:

## Businesses Involved

Business #   0001
Event Association:   VICTIM
Business Name:  STATE OF FLORIDA        Business Type:  GOVERNMENT PUBLIC BUILDING
Address:  ,        Sector/Beat:
Phone Type 1:  WORK        Phone# 1:  (  )  -        Ext 1:
Phone Type 2:        Phone# 2:  (  )  -        Ext 2:

Printed by: 01600
Printed date/time:   10/23/14 8:33

# Incident Report

**CITY OF MIAMI POLICE DEPARTMENT**
**400 NW 2 AVENUE**
**MIAMI, FLORIDA 33128**
**(305) 579-6111**

**Incident Number: 140609-168817**

## Narratives

ENTERED DATE/TIME: 9/21/2014 13:48:41
NARRATIVE TYPE:  ARREST
SUBJECT:  ESCOTO ROJAS,MOISES DAVID
AUTHOR:  BELFORT, SHEILA

I OBSERVED THE DEF DRIVING A 2006 MAZADA M3 BLACK 4DR TAG#PC6 551) TRAVELING
WESTBOUND ON SW 8 AVE/7 ST. THE DEF WAS STOPPED FOR CHANGING LANES WITHOUT SIGNAL
ALMOST CAUSING AN ACCIDENT SUMMONS#A1AAFMP. THE DEF WAS ASKED TO PRODUCE A
DRIVER LICENSE. AT THAT TIME, THE DEF STATED "OFFICER I DON'T HAVE A DRIVER LICENSE I AM
WAITING ON MY PAPERS" AND HANDED ME A HONDURAS PASSPORT. THE DEF ALSO STATED TO
ME THAT HE HAS PREVIOUS TICKETS FOR DRIVING WITHOUT A DRIVER LICENSE WHICH HE PAID
FOR THE TICKETS AND HE HAS BEEN IN UNITED STATES FOR 9 YEARS. A COMPUTER CHECK
REVEALED THE DEF DO NOT HAVE A VALID DRIVER LICENSE. THE DEF WAS ARRESTED AND
TRANSP TO TGK.

# Exhibit E

# City of Miami



DANIEL J. ALFONSO
City Manager

**REGISTERED MAIL:**                                        JUL 0 3 2014

Emma Rojas

████████████████

**REFERENCE:  MIAMI POLICE INTERNAL AFFAIRS CASE #14-124**

Dear Mrs. Rojas:

This letter serves as a follow-up on the status of your complaint, which was filed on June 10, 2014. We are actively investigating this case, gathering information, statements, facts and all other pertinent information needed in order to make a final decision on the findings of this complaint.

If you have any questions or concerns, please do not hesitate to contact Sergeant Um Ramos at (305) 835-2000.

Thanking you in advance for your patience and understanding.

Sincerely,

Jorge Colina
Major
Internal Affairs Section
for    Manuel Orosa
Chief of Police

JC:sa






MIAMI POLICE DEPARTMENT/P.O. BOX 016777 / Miami, Florida 33101 / (305) 603-6100
E-Mail Address: chiefofpolice@miami-police.org

# City of Miami



DANIEL J. ALFONSO
City Manager

**REGISTERED MAIL:**

JUL 0 3 2014

Moises Escoto

████████████████

REFERENCE:  MIAMI POLICE INTERNAL AFFAIRS CASE #14-124

Dear Mr. Escoto:

This letter serves as a follow-up on the status of your complaint, which was filed on June 10, 2014. We are actively investigating this case, gathering information, statements, facts and all other pertinent information needed in order to make a final decision on the findings of this complaint.

If you have any questions or concerns, please do not hesitate to contact Sergeant Um Ramos at (305) 835-2000.

Thanking you in advance for your patience and understanding.

Sincerely,

Jorge Colina
Major
Internal Affairs Section
for    Manuel Orosa
Chief of Police

JC:sa






MIAMI POLICE DEPARTMENT/P.O. BOX 016777 / Miami, Florida 33101 / (305) 603-6100
E-Mail Address: chiefofpolice@miami-police.org

Rte.   C/O   Krome SPC
18201   SW   12 STh   Street
Miami,   FL   33194

3313035536309

TO.   Emma C. Heredia

Miami FL. 33130



# Exhibit F



# Bond Hearing Results

| | | | |
|---|---|---|---|
| Date: 02/20/2016(AM) | JAIL: 160127254 | PCN: | DEPT: 001 |
| CCN: F16002841 | ARREST DATE: 02/19/2016 | JUDGE: STEPHEN MILLAN | |
| CIN: 0298371 | RACE: W | SEX: F | DOB: ▓▓▓▓▓ |
| NAME: CABRERA-GONZALEZ, MARIA ILUSION | SECT: F006 | TYPE: 1 | COURTROOM: 3 - 3 |

**PC:**

PC Found ☐   Date: _2/22/16_          ASA HWD

**BOND:**

1  GRAND THEFT 3RD DEG       Bond Amount: $5000
2  FLS PERS OFF/FELONY       Bond Amount: $45,000

                                              **TERMS:**

☐ **ROR** Reason:_____       _____
☐ **Bond Out**                     _____
☐ PTS    alt. bond _____       _____
☐ TAP    alt. bond _____       _____
☐ House Arrest   alt. bond _____
☐ Cust. Rel. _____   alt. bond _____
☐ Stay Away Order: _____

**HOLDS:**
☐ Felony BOND
☐ ICE HOLD                    ✶ _Nebbia_ ✶
☐ Felony PROBATION              _Hold_
☐ FUGITIVE
☐ Other HOLD _____

**RESET:**
☐ NBC              ☐ WARD D
☐ PCH              Issue/Reason: _____

**NOTES FOR DIVISION ASA:**
☐ Pull Bond Tape

Defendant's Statements: _Nebbia Hold - N/C moves to remove Nebbia Hold → K argues vigorously against removal_

Victim's Statements: _____
_____  _Judge Hersch/Hirsh ordered Nebbia hold_

Notes: _A form doesn't contain the facts - Get SAO_  ✓
_Judge Guzman says he will not overrule Judge Hirsch_



IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI- DADE COUNTY, FLORIDA   FALL TERM, 2015

THE STATE OF FLORIDA  v.

    MARIA ILUSION CABRERA GONZALEZ

    Defendant(s)

INFORMATION  FOR

1. GRAND THEFT 3RD DEGREE 812.014(2)(C)  FEL. 3D
2. FALSELY PERSONATE OFFICER/COMMISSION OF FELONY
   843.08 FEL 2D

---

N THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

    **KATHERINE FERNANDEZ RUNDLE,** State Attorney of the Eleventh Judicial Circuit,
rosecuting for the State of Florida, in the County of Miami-Dade, by and through her undersigned
Assistant State Attorney, under oath, Information makes that:

HARDIMAN,JOHNETTE L.   :LR  03/07/2016
DIRECT FILE - WARRANT ALREADY FILED

Jail No.  ,Bkd:  , CIN: 0298371, W/F, ▮▮▮▮▮▮▮

F16002841

Millan, Steve (F006)



(CC#: F16002841)

## COUNT 1

    MARIA ILUSION CABRERA GONZALEZ, on or between June 09, 2014 and June 16 2014, in the County and State aforesaid,   did unlawfully and knowingly obtain or use, or endeavor to obtain or use, U.S. coin or currency valued at three hundred dollars ($300.00) or more, but less than five thousand dollars ($5,000.00), the property of  EMMA ROJAS DE HEREDIA AND/OR MOISES ESCOTO AND/OR CRISTHIAM MORALES, as owner or custodian, with the intent to either temporarily or permanently deprive said owner or custodian of a right to the property or a benefit therefrom, or appropriate the property to said defendant's own use or to the use of a person not entitled thereto, in violation of s. 812.014(2)(c), Fla. Stat., contrary to the form of the Statute in such cases  made and provided, and against the peace and dignity of the State of Florida.

(CC#: F16002841)

## COUNT 2

    And the aforesaid Assistant State Attorney, under oath, further information makes MARIA ILUSION CABRERA GONZALEZ, on or between June 09, 2014 and June 16 2014, in the County and State aforesaid,   did unlawfully and falsely assume or pretend to be an officer, by representing that that he was  AN OFFICER OF THE CITY OF MIAMI POLICE DEPARTMENT officer and did take upon himself or herself to act as such during the commission of a felony, to wit:   GRAND THEFT, in violation of s. 843.08, Fla. Stat., contrary to the form of the Statute in such cases  made and provided, and against the peace and dignity  of the State of Florida.

(CC#: F16002841)

**STATE OF FLORIDA, COUNTY OF MIAMI-DADE:**

      Personally known to me and appeared before me, the Assistant State Attorney of the Eleventh Judicial Circuit of Florida whose signature appears below, being first duly sworn, says that the allegations set forth in this Information are based upon facts which have been sworn to as true by a material witness or witnesses, and which if true, would constitute the offenses therein charged, and that this prosecution is instituted in good faith.

Assistant State Attorney/Bar #: 793752
1350 NW 12th Ave., Miami, FL  (305) 547-0100

Sworn to and subscribed before me this ____7th____ day of __March__, 2016.

By _____

Deputy Clerk for Clerk of the Courts, or
Notary Public

# Exhibit G

| IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA    153 | CLOCK IN |
|---|---|

**CRIMINAL**      **JUDGMENT**

**DIVISION**

2016 MAR 23 PM 4: 23
CLERK, CIRCUIT & COUNTY COURTS
DADE COUNTY, FLA.
CIRCUIT CRIMINAL #4

FILED FOR RECORD

THE STATE OF FLORIDA      VS.

     MARIA ILUSION CABRERA GONZALEZ

**PLAINTIFF**      **DEFENDANT**

**CASE NUMBER:**    **F16002841**

Idania Arencibia, Maria Cabrera, Maria I Cabrera, Maria Ileana Cabrera, Maria Ilusion Cabrera, Maria Ilusion Cabrera-gonzalez

The Defendant, MARIA ILUSION CABRERA GONZALEZ, being personally before this Court represented by
ORLANDO RODRIGUEZ, PA, his/her attorney of record.
The State represented by JOHNETTE HARDIMAN, Assistant State's Attorney, and having:

• entered a plea of guilty
• DNA taken pursuant to Florida Statute 943.325

to the following crime(s):

| COUNT | CRIME | DEGREE | OFFENSE STATUTE NO. |
|---|---|---|---|
| 1 | GRAND THEFT 3RD DEGREE | 3/F | 812.014(2)(C) |
| 2 | FALSELY PERSONATE OFFICER/COMMISSION OF FELONY | 2/F | 843.08 |

and no cause being shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the
Defendant is hereby ADJUDICATED GUILTY of the above crime(s).

REV 10/02  MD 03/18/16 MD 03/18/16 JV 03/21/16      Page 1 of 3      Clerk's web address: www.miami-dadeclerk.com

Bk 30014 Pg 353 CFN 20160180536 03/28/2016 09:57:16 Pg 1 of 3 Mia-Dade Cty, FL

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| CRIMINAL DIVISION | CHARGES/COSTS/FEES | CASE NUMBER: F16002841 |
|---|---|---|

| THE STATE OF FLORIDA | VS. |
|---|---|
| | MARIA ILUSION CABRERA GONZALEZ |
| PLAINTIFF | DEFENDANT |

Idania Arencibia, Maria Cabrera, Maria I Cabrera, Maria Ileana Cabrera, Maria Ilusion Cabrera, Maria Ilusion Cabrera-gonzalez

The Defendant is hereby ordered to pay the following sum indicated:

| | |
|---|---|
| $50.00 | Pursuant to Florida Statute 938.03(4) (Crimes Compensation Trust Fund). |
| $3.00 | Three dollars as a court cost pursuant to Florida Statute 938.01 (1) $3.00 (Criminal Justice Trust & Education Funds). |
| $20.00 | Pursuant to Florida Statute 938.06 (Crime Stopper's Programs). |
| $3.00 | Pursuant to Florida Statute 938.19 (Teen Courts). |
| $50.00 | Pursuant to Florida Statute 775.083(2) (Crime Prevention Programs). |
| $2.00 | Two dollars as a court cost pursuant to Florida Statute 938.15 $2.00 (Criminal Justice Trust & Education Funds). |
| $100.00 | Pursuant to Florida Statute 938.25 (Operating Trust Fund of the Department of Law Enforcement). |
| $65.00 | Pursuant to Florida Statute 939.185(1)(a) (Assessment of Additional Court Costs as Adopted by Ordinance 04-116). |
| $85.00 | Pursuant to Florida Statute 939.185(1)(b) (Surcharge as adopted by Ordinance 05-123). |
| $100.00 | Cost of prosecution Florida Statute 938.27(8) |
| $225.00 | Additional cost fine and forfeiture Florida Statute 938.05 |

| | |
|---|---|
| $703.00 | TOTAL |
| STAY DUE DATE: | 3/11/2017 |

DONE AND ORDERED in Open Court in Miami-Dade County, Florida this 11th day of March, 2016.

JUDGE STEPHEN THOMAS MILLAN     DIV. F006

(W = Waived, S = Suspended, P = State Negotiated Plea)     Page 2 of 3     Clerk's web address: www.miami-dadeclerk.com

☑ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☑ CRIMINAL<br>☐ OTHER | FINGERPRINTS OF DEFENDANT |
|---|---|

THE STATE OF FLORIDA    VS. *Maria Ilusion Cabrera Gonzalez*

| PLAINTIFF | DEFENDANT |
|---|---|

CASE NUMBER: *F16-2841*

I hereby certify that the foregoing fingerprints on this judgment are the fingerprints of the defendant named above, and that they were placed thereon by said defendant in my presence, in open court, on this date and that the defendant provided the below Social Security Number or was unable to provide said number as indicated.

Fingerprints taken by: _J. Boykin, Cor_
Name                Title

**CLOCK IN**

**FILED**

MAR 11 2016

**CLERK**

## FINGERPRINTS OF DEFENDANT

| 1. R. Thumb | 2. R. Index | 3. R. Middle | 4. R. Ring | 5. R. Little |
|---|---|---|---|---|
| 1. L. Thumb | 2. L. Index | 3. L. Middle | 4. L. Ring | 5. L. Little |

Social Security Number of Defendant _____

DONE AND ORDERED in Open Court in Miami-Dade County, Florida this _____ day of MAR 11 2016, 20 _____

_Stephen T. Millan_
JUDGE
STEPHEN T. MILLAN
CIRCUIT COURT JUDGE

Page **3** of **3**

CLK/CT 854  REV. 7/03

Clerk's web address:  www.miami-dadeclerk.com

Bk 30014 Pg 355 CFN 20160180536 03/28/2016 09:57:16 Pg 3 of 3 Mia-Dade Cty, FL

Logged in date 2/5/16
AWPS# 16-101   Date created 2/5/16
AWPS created by Wede

**STATE ATTORNEY**
**11TH JUDICIAL CIRCUIT - MIAMI-DADE COUNTY, FLORIDA**

STATE of FLORIDA
V.

Case #: F16-2841
Police Case #:
Judge: MIIAN
Prosecutor: J. Hardiman

| | Defendant | DOB | Speedy Trial Date | HO Review | Local Priors | FCIC/ NCIC | City Priors | Juvenile Priors | Defense Attorney |
|---|---|---|---|---|---|---|---|---|---|
| A | Cabrera Gonzalez, Nana | | | | | | | | |
| B | | | | | | | | | |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |

21st day 3/11/16 Arraignment date
PRRP filed Y ☐ N ☐ Career Criminal status
Notice of Enhanced Penalty filed Y ☐ N ☐ Date

SENT/16
REVIEW

RESTITUTION $2,400 Requested ☑
Amount $ _____ Receipts ☐
Consulted: Victim ☑ Officer ☑

| **FELONY CHARGES** | **GUIDELINES** | **DISCOVERY SENT** |
|---|---|---|
| 1 Grand theft 3rd Degree | A NSPS | |
| 2 Falsely Personate Officer/Commission | B | |
| 3 | C | |
| 4 | D | |
| 5 | E | |

**REPORTS and TRIAL DATES**

| DATE | ASA | PURPOSE or EXPLANATION |
|---|---|---|
| 3.8.16 | | FILED, WPNG |
| 3.11.16 | | 1st ARR - APG, Adj, CTS (2 days) 1 yr. CC, followed by 4 yrs prob. We each w/ 1 month, rest $2,400 (complete by 3/10/16), gambling counseling (3X per week), CSH (20 hrs per month), stay out of gambling establishments, no ride-alongs w/ law enforcement, must participate in Cost Options & transitions to find work (must have 10 job interviews per month until employed), no contact w/ V or family, S cannot volunteer or work anywhere she would wear a uniform indicating any form of public trust, letter of apology to V. |

☐ BINDDOWN   ☐ DV BINDDOWN

ECC (INFO) 2/16/16

FEB 0 5 2016

Cabrera Gonzalez, Nana Ilusion

002841

## PB2 DATA COLLECTION & REGULAR FELONY DISPO FORM
_due within 1 week of close date for all cases closed on or after 09/01/2001_

Trial Div/Unit & #: Special Prosecution Intake

Closing ASA: Johnette Hardiman

Defendant: Maria Cabrera Gonzalez

Filed Section # & Judge: Stephen Millan

Close date: 3/11/2016

Court Case Number: F16-2841

---

☐ EXECUTIVE ASSIGNMENT
Circuit:_____

**IF CLOSED BEFORE TRIAL BEGAN**
☒ PLEA: check 1 box in each column
  ☐ State (Plea=1)  ☒ Guilty (OCD=01)
  ☒ Court (Plea=2)  ☐ No Contest (OCD=02)
☐ NOL PROS (OCD=15; MM=N)
  ☐ successful completion diversion program (OCDR=35)
  ☐ other reason:_____
  (OCDR= table value 01-37)
☐ DISMISSAL (MM=D)
  ☐ Legal Grounds (OCD=13)
  ☐ Factual Grounds (OCD=14)
  ☐ Defendant Incompetent (OCD=12)

**SENTENCING GUIDELINE INFORMATION**
☐ Above (SG=3)
☐ Below (SG=2)
☒ Within (SG=1)
☐ N/A (SG=4) (capital or life crime only)
**CLOSING CHARGES**
☒ Felony
☐ Misdemeanor

**IF CLOSED AFTER TRIAL BEGAN**
☐ Jury Impaneled: venire brought down &/or questioned
☐ Jury Sworn
☐ Bench Trial: witness sworn

**OUTCOME:**
☐ VERDICT
  ☐ Guilty (OCD=03/JT or 08/BT; MM=C)
  ☐ Not Guilty (OCD=04/JT or 09/BT; MM=A)
  ☐ NG Insanity (OCD=05/JT or 10/BT; MM=A)
☐ ACQUITTAL (MM=A)
  ☐ Judgment of Acquittal/JOA (OCD=18)
  ☐ Stipulated Insanity Acquittal (OCD=11)
☐ DISMISSAL (MM=D)
  ☐ Legal Grounds (OCD=13)
  ☐ Factual Grounds (OCD=14)
☐ MISTRIAL
☐ NOL PROS (OCD=16; OCDR= table value 01-37; MM=N)
  Reason:_____
**OR**
☐ PLEA: check 1 box in each column
  ☐ State (Plea=1)  ☐ Guilty (OCD=06)
  ☐ Court (Plea=2)  ☐ No Contest (OCD=07)

---

**Probation Violation**
**VFOSC Designation:** _crimes committed after 3/11/07_
_(Processed by Designated Staff Only)_

☐ Possible  ☐ Yes ☐ No (If Sentenced below Guidelines)
Explanation (if No) _____
☐ Revoked or Modified (New entry made in CJIS)
☐ Reinstated (No entry made in CJIS)

---

**Sentence information: def.PG,** Adj, Cts (21 days); 1 yr. cc, followed by 4 yrs probation, Gamblers Anonymous (3x per week), csh(20 hrs per month), stay out of gambling establishments, no ride alongs w/law enforcement, must participate in court Options/ Transitions to find work (must have 10 job interviews per month until employed), no contact w/v or family, def. cannot volunteer or work where she would wear a uniform indicationg any form of public trust, letter of apology to v.

**Special conditions:** ankle moniton

**QUALIFIED** (for _any_ enhancement) ☐ Yes ☒ No

**SENTENCED AS:** (Check all appropriate enhancements below)
☐ Special Habitual Violent Offender (CC=A)
☐ Habitual Offender (CC=B)
☐ Habitual Violent Offender (CC=C)
☐ "Variable" Habitual Offender (CC=D)
☐ "Variable" Habitual Violent Offender (CC=E)
☐ Gort (CC=G)
☐ Gort/Firearm (CC=H)
☐ Three-Time Violent Felony Offender (CC=T)

☐ PRRPA - Prison Releasee Reoffender (PSI=P)
☐ Three-Time Violent Felony Offender (PSI=T)
☐ Narcotics-Trafficking in a Controlled Substance (PSI=L)
☐ Repeat Sexual Batterer (PSI=S)
☐ 10/20/Life (PSI=X)

☐ Juvenile - Did State object? ☐ Yes ☐ No

**RESTITUTION: RECOMMENDED** ☒ Yes ☐ No  ☐ **NOT APPLICAB**LE for this case
Pay to witness #: In care of John DeLeon  Amt: $2,400 pd by 3/16/16 . ☒ Ordered (O) ☐ Reserved (R)
Pay to witness #:_____  Amt: $_____ . ☐ Ordered (O) ☐ Reserved (R)
Other PAYEE:_____  Amt: $_____ . ☐ Ordered (O) ☐ Reserved (R)

**PROPERTY RELEASE:** ☐ Yes (PR=Y) ☒ No (PR=N)  Reason:_____

Additional comments noted on reverse side of original or attached:  ☐YES ☐NO

CLOSING ASA: _____   CJIS #: _749_____   DATE: _3/10/16_____

APPROVED BY: _____   CJIS #: _____   DATE: _____

**Law Office of Orlando Rodriguez, P.A.**
8603 South Dixie Highway, Ste 218
Miami, Fl 33143
786-208-3290

CITIBANK, N.A.
PINECREST, FL 33156
63-8655/2660

3/16/

PAY TO THE
ORDER OF    _Emma Rojas and/or Chavez and DeLeon PA Trust Account_    $ 2,400

_Two Thousand Four Hundred_ DOL

_Restitution State v. Cabrera_
_F16-2841_





THE LAW OFFICES OF

# CHAVEZ & DE LEÓN, P.A.

JOHN DE LEÓN
*Attorney At Law*

1399 SW 1st Ave. Suite 202
Miami, FL 33130

jdeleon@chavez-deleon.com • Ph (305) 740-5347 • Fax (305) 740-5348
www.chavez-deleon.com

I, Orlando Vanegas, do hereby certify that the above - a
Check was presented to me by Attorney Orlando Rodriguez.
Check will be taken to The Law offices of Chavez & De Leon as
restitution for Criminal case # F16-2841. This check is a fin
and complete payment by Maria Cabrera for restitution.

X _(signature)_

JAVIER RODRIGUEZ
MY COMMISSION # EE871600
EXPIRES February 05, 2017
(407) 398-0153   FloridaNotaryService.com

March 16, 2016

# Exhibit H

JOHN de LEON, Esq.

LAW OFFICES OF
CHAVEZ & DE LEON, P.A.

1399 SW 1ˢᵗ Ave. Suite 202
Miami, FL 33130
Telephone: 305-740-5347 / 877-740-0300
Fax: 305-740-5348

## NOTICE OF INTENT TO FILE A CLAIM

### Via Certified Mail

**Certified mail:**
**701 to 0470000123903102**

Manuel Orosa
Chief of Police
City of Miami Police Department
400 N.W.2d Avenue
Miami, FL 33128

Tomas Regalado
Mayor, City of Miami
City Hall 3500 PanAmerican drive,
Miami, FL 33133
**Certified Mail: 70120470000123903119**

Florida Department of Financial Services
Service of Process Section
200 E. Gaines Street
Tallahassee, Florida 32399
**Certified Mail: 70120470000123903126**

Re: Our Client:     **MOISES DAVID ESCOTO ROJAS**
█████████████
**Place of Birth:  San Pedro de Sula, Honduras**
**Social Security Number:  N/A**
**No claims/judgments outstanding with State of Florida**

Dear Sir/Madam:

Please take notice that the above named claimant intends to file a claim against the City of Miami Police Department, Shiela Belfort its and 6 John Doe police officers.

The claimant sustained damages as a result of the: a) unlawful seizure and b) unlawful detention in order to secure payments to police officers for his release c) extortion, d) kidnapping e) battery f) false arrest. As such, Mr. Escoto suffered from intentional infliction of emotional distress on the part of the City of Miami Police Department due to their negligent hiring and supervision of the officers involved. The police violated the claimant first 4ᵗʰ and 5ᵗʰ and 14ᵗʰ amendment rights under the United States Constitution as well as his rights under the Florida Constitution.

Pursuant to Florida Statute 768.28, the City of Miami and City of Miami Police Department is hereby formally advised as follows.  Claimant was a resident of Miami, FL and. The city's efforts were directed by city officials and resulted in the following unlawful actions taken against claimant:

FERNANDO CHAVEZ, ESQ.  Admitted only in CA .
1530 The Alameda #301 San Jose, CA. 95126 Telephone: 408- 971-3903 Fax: 408-971-0117

LAW OFFICES OF
# CHAVEZ & DE LEON, P.A.

On or about June 9, 2014. The claimant, a young Hispanic man was driving when he noticed a police officer in a police vehicle. The young man proceeded to drive as cautiously as possible in order to avoid being stopped by the officer. While the young man was driving cautiously, the police officer drove up next to him while driving at the same speed. The officer, Shiela Belfort, then pulled him over and told the young man that he was speeding; the young man said that he was not speeding because they were going the same speed. The young man was placed in the police vehicle under the pretext that he was driving without a license, an activity that is illegal for undocumented immigrants in the United States. The officer, along with a plain clothed police officer who was in the vehicle as well, drove to the City of Miami Police Department on Flagler and SW. 22nd Ave. where the plain clothed officer exited the police vehicle and into a late model black Mercedes-Benz.

After which the uniformed officer drove the young man around for an extended period of time (several hours). Meanwhile, the plain clothed police officer went to the home of the young man's mother, Emma Rojas, at 244 SW. 9 Street, Miami Florida and, because she was not home at the time, asked the neighbors for her phone number because her son had been arrested. The plain clothed officer got a hold of the young man's mother and told her that if she paid $2,400, then her son would not be arrested.

Upon learning this information, the young man's mother scrambled to obtain the $2,400 from friends and family. The amount requested was paid, however, the young man was arrested for a traffic offense anyway. Eventually, the young man bonded out of jail and he and his family filed a complaint with the Internal Affairs Department of the City of Miami Police Department.

A few months later, on or about August 27, 2014, the young man attended court for the traffic offense, where the case was reset for court at another time. While leaving the courthouse, he was picked up by Immigration and Customs Enforcement ("ICE") who had been waiting for him outside for allegedly illegally re-entering the United States. Officer Belfort was at the Courthouse when this occurred. This action ICE would prevent the claimant from taking action against a police officer and was further evidence of retaliation against the claimant

1) Claimant was falsely detained on June 9, 2014th by the city of Miami police officers.

2) City of Miami police officers were without a warrant and against his wishes and detained the claimant.

3) Claimant was unlawfully touched and battered, handcuffed and grabbed during the course of his false detainment and suffered harm as a result.

4) On June 9, 2014 City of Miami police extorted money from the claimant's mother in order for him to be released in Violation of the First, Fourth, Fifth, and Fourteenth Amendment rights of Claimant.

LAW OFFICES OF
# CHAVEZ & DE LEON, P.A.

5) The claimant was detained inside a marked police unit and driven in and out of the jurisdiction of the city of Miami against his wishes in order for the city of Miami police officers to facilitate their receipt of moneys allegedly to obtain his release on June 9, 2014T

Such conduct by the City of Miami police officers, city officials, and police officers violated Mr. Escoto Rojas' civil rights, his constitutional right to be free from unreasonable seizures of his persons, and his right to due process of law, his right to be free from extortion, kidnapping, false imprisonment, intentional infliction of emotional harm and as such is actionable under Florida common law.  Mr. Escoto Rojas suffered damages as a consequence of the aforementioned officers' actions, including but not limited to physical injuries, economic losses and non-economic damages including humiliation, scorn, ridicule, and emotional/psychological distress.

Accordingly, please take this letter as claimant's formal statutory, pre-suit notice pursuant to the terms and provisions of Florida law.

Respectfully,

John de Leon, Esq.

CHAVEZ& DE LEON, P.A.
1399 SW 1ª Ave. Suite 202, Miami, FL 33130 Telephone: 305-740-5347 Facsimile: 305-740-5348

3

USPS.com® - USPS Tracking                                        https://tools.usps.com/go/TrackConfirmAction.action?tLabels=70...1 of 1 pag...

# USPS.COM

## USPS Tracking™



**Customer Service ›**
Have questions? We're here to help.



**Get Easy Tracking Updates ›**
Sign up for My USPS.

---

Tracking Number: 70120470000123903126

Updated Delivery Day: **Friday, September 19, 2014**

## Product & Tracking Information                      Available Actions

Postal Product:                    Features:
                                   Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **September 22, 2014 , 9:14 am** | Delivered | **TALLAHASSEE, FL 32311** |

Your item was delivered at 9:14 am on September 22, 2014 in TALLAHASSEE, FL 32311.

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| September 19, 2014 , 9:36 am | Available for Pickup | TALLAHASSEE, FL 32311 |
| September 19, 2014 , 8:14 am | Out for Delivery | TALLAHASSEE, FL 32301 |
| September 19, 2014 , 8:04 am | Sorting Complete | TALLAHASSEE, FL 32301 |
| September 19, 2014 , 3:10 am | Arrived at Unit | TALLAHASSEE, FL 32301 |
| September 18, 2014 , 7:50 pm | Departed USPS Facility | TALLAHASSEE, FL 32301 |
| September 18, 2014 , 7:04 pm | Arrived at USPS Facility | TALLAHASSEE, FL 32301 |
| September 17, 2014 , 10:11 pm | Departed USPS Facility | MIAMI, FL 33152 |
| September 17, 2014 , 6:10 pm | Arrived at USPS Facility | MIAMI, FL 33152 |

## Track Another Package

Tracking (or receipt) number

[                                        ]  [ Track It ]

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



---

Search or Enter a Tracking Number 🔍

| HELPFUL LINKS | ON ABOUT.USPS.COM | OTHER USPS SITES | LEGAL INFORMATION |
|---|---|---|---|
| Contact Us | About USPS Home | Business Customer Gateway | Privacy Policy |
| Site Index | Newsroom | Postal Inspectors | Terms of Use |
| FAQs | USPS Service Updates | Inspector General | FOIA |
| | Forms & Publications | Postal Explorer | No FEAR Act EEO Data |
| | Government Services | National Postal Museum | |
| | Careers | Resources for Developers | |

Copyright © 2015 USPS. All Rights Reserved.

English    Customer Service    USPS Mobile                                    Register / Sign In

## USPS.COM®

# USPS Tracking™



**Customer Service ›**
Have questions? We're here to help.



**Get Easy Tracking Updates ›**
Sign up for My USPS.

---

Tracking Number: 7012047 0000123903102

## Product & Tracking Information

### Available Actions

Postal Product:                Features:
                               Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| September 19, 2014 , 9:25 am | Delivered | MIAMI, FL 33101 |
| Your item was delivered at 9:25 am on September 19, 2014 in MIAMI, FL 33101. | | |
| September 18, 2014 , 1:12 am | Departed USPS Facility | MIAMI, FL 33152 |
| September 17, 2014 , 6:10 pm | Arrived at USPS Facility | MIAMI, FL 33152 |

## Track Another Package

Tracking (or receipt) number

[                                        ]    [ Track It ]

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**

**HELPFUL LINKS**

Contact Us

Site Index

FAQs

**ON ABOUT.USPS.COM**

About USPS Home

Newsroom

USPS Service Updates

Forms & Publications

Government Services

Careers

**OTHER USPS SITES**

Business Customer Gateway

Postal Inspectors

Inspector General

Postal Explorer

National Postal Museum

Resources for Developers

**LEGAL INFORMATION**

Privacy Policy

Terms of Use

FOIA

No FEAR Act EEO Data

Copyright © 2015 USPS. All Rights Reserved.

Search or Enter a Tracking Number

same-origin

navigate

?1

document

gzip, deflate, br

en-US,en;q=0.9

session=abc123

https://example.com

Mozilla/5.0

max-age=0